**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Crim. No. 12-303 (NLH)** |
| | : | |
| **V.** | : | |
| | : | |
| | : | **OPINION** |
| **ADAM LACERDA,** | : | |
| **a/k/a "Robert Klein,"** | : | |
| *et al.* | : | |


**Hillman, District J.**

     Presently before the Court is the Motion of the United States of America (hereinafter "United States" or "the Government") to disqualify Defendant Adam Lacerda's counsel of record, Marc Neff, Esq.  For the reasons set forth below, the Court finds that Mr. Neff faces, or is likely to face, significant conflicts of interest.  The Court further finds that, based on the record before it, these conflicts cannot be waived or cured by remedial measures other than disqualification.  Accordingly, the Court will grant the United States' Motion, and will disqualify Mr. Neff from further representation of Defendant Adam Lacerda in this matter.

1

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The full factual background of this case is familiar to all parties, and the Court therefore only discusses the facts relevant to the instant Motion. Defendant Adam Lacerda and his wife Ashley Lacerda are the former co-owners of Vacation Ownership Group ("VO Group"), a company engaged in the business of buying and selling vacation timeshare properties. The Indictment[1] in this matter charges that, from March 2009 through on or about September 2011, the Lacerdas and at least sixteen others conspired to commit mail and wire fraud. More specifically, the Government alleges that the conspirators devised and executed a scheme to defraud timeshare owners of their money and property. As part of the alleged scheme, the conspirators called timeshare owners and falsely represented to them that the VO Group could assist them in selling their timeshares and in paying off the loans on their properties. The conspirators allegedly reached out to property owners under the guise that they were responding to a complaint previously made by the owner that was forwarded to the VO Group for investigation, when in

_____

[1] A superseding indictment was filed on January 23, 2013. [<u>See</u> Docket No. 79.]

2

actuality the VO Group had no knowledge of such a complaint. When communicating with the property owners, the conspirators allegedly followed a sales pitch "script" designed by Adam Lacerda. According to the alleged script, VO Group employees told the owners that the company worked with banks and lending institutions holding the loans used to finance the timeshares. The script also directed employees to tell clients that the VO Group could "settle" mortgages for a fraction of the actual remaining balance by sending money directly to the company, and that utilization of the VO Group's services would not damage clients' credit scores. The Government contends, however, that the VO Group did not maintain relationships with any banks or lending institutions, but rather used the money collected for its own benefit.

On November 4, 2010, the Federal Bureau of Investigations ("FBI") executed a search warrant at the offices of the VO Group. After the search, several VO Group employees were concerned about the effects that the ongoing investigation might have on the company and its personnel. At the same time, Adam Lacerda changed the text of the sales pitch scripts to eliminate the representations that the VO Group worked with banks and lending institutions to settle outstanding mortgages. However, the

3

government alleges that the scripts continued to include statements that VO Group employees were calling in reference to a complaint, and that utilizing the company's services would not damage their credit scores.

On November 5, 2010, the day after the execution of the search warrant, Mr. Neff was retained to represent Adam Lacerda.[2] Approximately one month later, on December 6, 2010, Mr. Neff and a private investigator met with several VO Group employees in the conference room at the company's

---

[2] The record reflects that Mr. Neff was initially retained as counsel for both Adam and Ashley Lacerda. By letter from the United States Attorney's Office, Mr. Neff was advised that a potential conflict of interest could arise due to his representation of both Lacerdas and their status as co-Defendants. On November 16, 2010, Mr. Neff communicated to the U.S. Attorney's Office that Ashley Lacerda had obtained separate counsel, and that he solely represented Adam Lacerda from that point onward. [See Def. Br. Opp'n, Ex. A.]

As noted by the Government, Mr. Neff's prior simultaneous representation of both Adam and Ashley Lacerda could give rise to another conflict of interest based on the duties counsel owes to current and former clients. [See Gov. Mot. at 3 n.1.] See United States v. Reeves, Crim.No.11-520, 2011 WL 6028000, at *6 (D.N.J. Dec. 2, 2011) (Simandle, J.) ("Given the numerosity of [counsel's] prior representations of individuals who are indicted defendants or witnesses in this matter, it is highly probable that [he] will be unable to represent [the defendant] due to the duties he owes to his large number of former clients. This creates a serious potential for a conflict of interest[.]"). The Government, however, makes no direct allegations on these grounds, but rather merely urges the Court to look into any potential conflict. Given that this issue is not the basis of the present Motion, the Court makes no finding on this point at this time.

offices.[3]   According to the statements of witnesses present for the meeting, Mr. Neff attempted to alleviate employee concerns about the ongoing investigation.  Specifically, he allegedly told the employees that: (1) he was Mr. Lacerda's attorney, (2) at that point in time, only Adam and Ashley Lacerda were targets of the FBI probe, and (3) the sales pitch scripts revised by Adam Lacerda after the FBI search were lawful because they removed references to the company's relationship with banks and other lending institutions.  According to the Government, after the meeting, several employees who had previously considered leaving the company stayed and continued to work for the VO Group, thereby furthering the fraudulent scheme.  In fact, the Superseding Indictment alleges that the conspiracy continued for approximately another ten months, and the VO Group employees continued to utilize the revised scripts whose legality was purportedly approved by Mr. Neff during

---

[3] As noted below, there are inconsistencies in the recorded recollections of the witnesses concerning Mr. Neff's communications with the employees.  Some are vague as to his name and whether the meeting was in person or by telephone.  These discrepancies aside, it is uncontroverted that Mr. Neff addressed the employees sometime soon after the search and communicated to them the statements central to the Government's motion.

this time.[4]   Furthermore, contrary to Mr. Neff's alleged

assertions that the Lacerdas were the only targets of the

---

[4] More specifically, the Superseding Indictment states that the following events relevant to the furtherance of the scheme took place after the November 4, 2010 search of the VO Group's offices:

- Count 1 — Conspiracy to Commit Mail Fraud and Wire Fraud: (Subsection e) — The Cape Bank issued a bank account in the VO Group's name on or about December 9, 2011; (Subsection hh) — On or about January 22, 2011, co-conspirator "C.B." emailed victim "J.L." and said that the VO Group's committee was meeting on Wednesday at 3:00 and that "C.B." had scheduled "J.L.'s" case to be heard at that time; (Subsection ii) — On or about March 14, 2011, co-conspirator "C.B." and defendant IAN RESNICK caused victim "J.L." to mail a check to the VO Group for $1,250.00; (Subsection jj) — On or about January 23, 2011, co-conspirator "E.K.R." called victim "K.B." on the telephone and said that the VO Group could get her out of her Wyndham timeshare and have her money refunded by Wyndham; (Subsection kk) — Co-conspirator "E.K.R." caused victim "K.B." to send a $5,000.00 check to the VO Group, which was deposited into the VO Group Bank Account on or about February 28, 2011.

- Count 35 — Conspiracy to Commit Money Laundering: (4) In furtherance of the conspiracy, on December 16, 2011, defendants ADAM LACERDA, a/k/a "Robert Klein," and ASHLEY R. LACERDA transferred $40,000.00 from the VO Group Cape Bank Account to their Personal Savings Account.

- Count 39 — Money Laundering: On or about December 16, 2011, defendants ADAM LACERDA, a/k/a "Robert Klein," and ASHLEY R. LACERDA knowingly transferred $40,000.00 from the VO Group Cape Bank Account to their Personal Savings Account. These funds were derived from unlawful activity, namely, conspiracy to commit mail and wire fraud.

- In addition to the above Counts, Counts 42 and 44 also allege criminal conduct by defendants IAN RESNICK and GENEVIEVE MANZONI that occurred after the date of the search of the VO Group's offices.

6

FBI probe, fourteen other VO Group employees were eventually charged by indictment or separate complaints during the course of the investigation.

In the fall of 2012, former VO Group employees Francis Santore, Joseph DiVenti, Ryan Bird, and Steven Cox participated in proffer sessions with the United States. Although the reliability of the witnesses' testimony is an issue disputed by the parties, the record reflects that, during these proffer sessions, all four witnesses recalled Adam Lacerda's attorney meeting with VO Group employees in the winter of 2010 to alleviate their concerns as to the ongoing investigation of the company and the Lacerdas.

Upon discovering this information, the United States contacted Mr. Neff regarding a potential conflict of interest, but he declined to withdraw from representation. The United States thereafter filed the instant Motion on November 8, 2012 seeking to disqualify him from further representing Adam Lacerda on the grounds that he played a role in a key event that furthered the charged conspiracy, and therefore suffered an inherent conflict of interest. [Docket No. 56.] Defendant responded in opposition on December 6, 2012, asserting that disqualification under the present circumstances is unnecessary, and requesting the

Court to conduct a further inquiry into the context of the potential testimony from the four witnesses at trial. [Docket No. 68.]  The Government replied on December 13, 2012 [Docket No. 69], and Defendant filed a Sur-Reply on December 19, 2012.[5]  On February 6, 2013, the Court held Oral Argument on this issue, at which time both parties were given the opportunity to be heard and present any additional evidence they wished the Court to consider on this matter.  Having now reviewed the parties' paper submissions and having had the benefit of oral argument, the Court will address the merits of the parties' arguments.

## II.  LEGAL STANDARD

The Sixth Amendment of the United States Constitution provides, in relevant part, that: "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defense." U.S. CONST. ART. VI.  The Supreme Court of the United States has interpreted this amendment to mean that a criminal defendant is not merely entitled to the assistance of

---

[5] Defendant filed a motion seeking leave to file a sur-reply, and attached a copy of the proposed filing to his motion. [See Docket No. 72.]  At the Oral Argument on February 6, 2013, the Court orally granted Defendant's request to file a sur-reply.  The Order accompanying this Opinion will reflect the Court's ruling on Defendant's Motion.

counsel, but to the assistance of counsel of his choice as well.  See United States v. Voigt, 89 F.3d 1050, 1074 (3d Cir. 1996) (citing Powell v. Alabama, 287 U.S. 45, 53 (1932)) ("One element of this [constitutional] guarantee is the right to counsel of choice.").  The primary purpose of this constitutional right is "to grant a criminal defendant control over the conduct of his defense — as 'it is he who suffers the consequences if the defense fails.'" United States v. Kolodesh, Crim.No.11-464, 2012 WL 1156334, at *3 (E.D. Pa. Apr. 5, 2012) (quoting United States v. Moscony, 927 F.2d 742, 748 (3d Cir. 1991)).  The right to counsel of choice, however, is not without limitation.  See Voigt, 89 F.3d at 1074. Rather, "[t]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988) (internal citations omitted).  Thus, in instances where "considerations of judicial administration supervene" or an attorney has a serious conflict of interest, the presumption in favor of counsel of choice is rebutted and the right must give way.  See Voigt, 89 F.3d at 1074 (citing Fuller v. Diesslin, 868 F.2d 604, 607 n.3 (3d Cir. 1989) (internal quotation marks omitted); Kolodesh, 2012 WL

1156334 at *3 (citing Wheat, 468 U.S. at 159). As expressly recognized by the Supreme Court:

> [The trial court] must recognize a presumption in favor of [the defendant's] counsel choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

Wheat, 486 U.S. at 164; see also Voigt, 89 F.3d at 1076. In seeking to disqualify counsel of the defendant's choice, the burden rests upon the government to prove that the attorney in question has an actual or serious potential for conflict. See Kolodesh, 2012 WL 1156334 at *4 (citing Wheat, 486 U.S. at 164; United States v. Steward, 185 F.3d 112, 121-22 (3d Cir. 1999)). In assessing whether the government has met its burden of proof, the district court must balance the defendant's Sixth Amendment constitutional right against "the proper and fair administration of justice." Voigt, 89 F.3d at 1074. Indeed, "[d]etermining whether such a potential conflict exists is no simple task [as] [t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." Id. at 1076 (citing Wheat, 486 U.S. at 162-63) (internal quotation marks omitted.)

10

In considering a motion for disqualification based on a conflict of interest, the Court is likewise guided by an additional set of rights "'[s]temming not from the Sixth Amendment but from the ethical precepts that govern the legal profession'" — the Code of Professional Responsibility that regulates attorney conduct. See Kolodesh, 2012 WL 1156334 at *4 (quoting Moscony, 927 F.2d at 748). The Supreme Court and Third Circuit Court of Appeals have both recognized that trial courts should not "tolerate" serious conflicts of interest in the representation of a defendant for the sake of continued representation by the accused's counsel of choice:

> [W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA [6] Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.

---

[6] ABA is an abbreviation for the American Bar Association.

Wheat, 486 U.S. at 162 (quoting United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir. 1978)).[7]

Thus, in proceeding forward with the disqualification motion, the Court will conduct a two-step inquiry: (1) first, it will determine whether the Government has satisfied its burden in establishing the presence of an actual or serious potential conflict of interest concerning Defense counsel's continued representation of the Defendant; and (2) if so, it will determine whether a waiver of conflict or other curative measure is appropriate under the circumstances in lieu of a formal disqualification. See Kolodesh, 2012 WL 1156334 at *4 (citing United States v. Massimino, Crim.No.09-496-04, 2011 WL 6371883, at *1 (E.D. Pa. Dec. 20, 2011)).

---

[7] The Court likewise notes that, in the District of New Jersey, the Local Rules for Civil and Criminal Procedure require attorneys practicing in this District to comply with the ABA Rules of Professional Responsibility. Local Civil Rule 103.1(a) specifically provides as follows:

> (a) The Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law.

L.Civ.R.103.1(a). Local Civil Rule 103.1 has been expressly incorporated within the Local Criminal Rules. See L.Crim.R.1.1 (adopting L.Civ.R. 103.1 in criminal proceedings).

### III.  LEGAL ANALYSIS

The United States sets forth two primary reasons for why it believes Mr. Neff should be disqualified from further representation: (1) he is likely to be called by the Government or a co-Defendant at trial as a fact witness, and his roles as a witness and advocate are in conflict; and (2) he has a personal interest at stake in protecting himself from criminal liability and disciplinary action based on his direct participation in an event that furthered the criminal scheme.  In response, the Defense contends that disqualification is unnecessary under these circumstances because the Government has not met its burden in establishing that Mr. Neff is a necessary witness, and Adam Lacerda will suffer a substantial hardship if his attorney is disqualified at this stage of the proceedings. The Defense also avers, however, that in the event the Court does find a conflict, Adam Lacerda is willing to waive it and agrees to a colloquy on the record.  At oral argument, the Defense also suggested that any potential conflict could be cured by a limiting evidentiary instruction at trial, according to which witnesses could testify regarding Mr. Neff's statements at issue, but would be permitted to merely state that "Mr. Lacerda's attorney" made the statements without revealing to the jury the

13

speaker's precise identity.  Finally, the Defense maintains that the evidence upon which the United States rests its disqualification request — namely, the FBI 302 statements — is unreliable, and therefore requests the Court to conduct a further inquiry into whether the statements made by the four witnesses will mirror their prospective testimony at trial.  The Court addresses each of these arguments in turn.

### A. Whether the United States Has Satisfied Its Burden in Establishing an Actual or Serious Potential Conflict of Interest

In determining whether the Government has satisfied its burden, the Court will consider whether a conflict is actually present under these circumstances, whether Adam Lacerda would be substantially harmed by the disqualification of his counsel of choice, and the interests of the other parties and entities in this matter.

### 1. The Conflicts of Interest

"It is beyond dispute that the Sixth Amendment guarantee of effective assistance of counsel encompasses the right to counsel's undivided loyalty." Kolodesh, 2012 WL 1156334 at *5 (citing Virgin Islands v. Zepp, 748 F.2d 125, 131 (3d Cir. 1984); Wood v. Georgia, 450 U.S. 261, 271 (1981)).  The Third Circuit has recognized that an attorney's loyalty and independent judgment are "essential

14

elements" of the attorney-client relationship, and that any personal interests of counsel that are "inconsistent, diverse, or otherwise discordant" with those of the client should not be permitted to have an adverse effect on the attorney's professional judgment.   Zepp, 748 F.2d at 135. Likewise, the New Jersey Rules of Professional Conduct ("N.J. R.P.C.") regulate the conduct of attorneys in such instances, and provide that:

> A lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if
>
> . . .
>
>> (2) there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer.

N.J. R.P.C. 1.7(a)(2).   Similarly, Rule 3.7 of the R.P.C. provides, in pertinent part, as follows:

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
>> (1) the testimony relates to an uncontested issue;
>> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>> (3) disqualification of the lawyer would work substantial hardship on the client.

N.J. R.P.C. 3.7(a).

15

The presence of actual and serious potential conflicts between an attorney's personal interest and that of his client has previously been discussed by our Court of Appeals and fellow district courts within its appellate jurisdiction. See Zepp, 748 F.2d at 127, 136; United States v. Merlino, 349 F.3d 144 (3d Cir. 2003) (Barry, J.); United States v. Kolodesh, Crim.No.11-464, 2012 WL 1156334 (E.D. Pa. Apr. 5, 2012); United States v. Massimino, 832 F.Supp.2d 510 (E.D. Pa. 2011); United States v. Patrick, 985 F.Supp. 543 (E.D. Pa. 1997); United States v. Sabarese, Crim.No.93-389, 1994 WL 118315 (D.N.J. Mar. 30, 1994); United States v. Reeves, Crim.No.11-520, 2011 WL 6028000 (D.N.J. Dec. 2, 2011) (Simandle, J.). In Merlino — a similar case involving multiple defendants engaged in a racketeering conspiracy — the district court disqualified a defense attorney that attempted to dissuade a witness from cooperating with the government. Id. at 151. On appeal, the Circuit Court affirmed on the grounds that the attorney's conduct created two potential conflicts. First, the court noted that counsel had an inherent personal conflict because "[a]n attorney who faces criminal or disciplinary charges for his or her actions in a case will not be able to pursue the client's interests free from concern for his or her own." Id. (citing United States v.

16

Greig, 967 F.2d 1018, 1022-23 (5th Cir. 1992) (holding that attorney who attempted to persuade client's co-conspirator not to cooperate with the government without informing co-conspirator's counsel had actual conflict of interest arising from his own unethical and possibly criminal behavior)). Second, the appellate court found that the attorney had a conflict between his personal interest and that of his client because there was the potential that he could be called as a witness at trial, and it is "often impermissible for an attorney to be both an advocate and a witness." Merlino, 349 F.3d at 151. In fact, in so finding, the Merlino Court noted that, "disqualification may also be appropriate where it is based solely on a lawyer's personal knowledge of events likely to be presented at trial, even if the lawyer is unlikely to be called as a witness." See id. (citing United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993)).

Similarly, our sister court in the Eastern District of Pennsylvania recently faced a largely similar scenario in United States v. Kolodesh. In that case, defense counsel endorsed a report that was used by the defendant in furtherance of a mail fraud scheme, and his name appeared in e-mails exchanged between co-conspirators indicating that counsel had "approved" the contents of the report.

17

2012 WL 1156334 at *2. Relying on Third Circuit precedent
and the Rules of Professional Conduct,[8] the court held that,
"[u]nder these circumstances, it is problematic . . . to
accept that [counsel] would vigorously pursue his client's
best interest entirely free from the influence of his
concern to avoid even the mere suggestion that his conduct
was professionally improper." Id. at *6 (internal citations
omitted). Specifically, the court found that the
attorney's role as a potential witness was inherently
inconsistent with his role as an advocate because he would
be tempted to focus on his own personal interest rather
than serving his client. Id. at *6-8. Accordingly, the
court found defense counsel suffered from an inherent
conflict of interest and should be disqualified.

Mr. Neff's conflict in the instant case is two-fold:
(1) he faces an actual conflict because evidence at trial
may show that he engaged in conduct for which he could be

---

[8] In Kolodesh, the court relied on the Pennsylvania Rules of
Professional Conduct. The conduct rules implicated in this
case, however, are virtually identical in Pennsylvania and
New Jersey, and the analysis in Kolodesh is therefore
applicable here. See Tangible Value, LLC v. Town Sports
Intn'l Holdings, Inc., No.Civ.A.10-1453, 2012 WL 4660865,
at *2 n.1 (D.N.J. Oct. 1, 2012) ("Pennsylvania Rule of
Professional Conduct 3.7, however, is identical to New
Jersey's and as a result, said distinction is one that
makes no practical difference."); Griffin-El v. Beard,
No.Civ.A.062719, 2009 WL 2929802, at *9 n.6 (E.D. Pa. Sept.
08, 2009) (noting same with respect to Rule 1.7).

subject to possible criminal liability or professional discipline, thereby placing his personal interest in self-preservation in direct juxtaposition to his client's interest in loyal and unbiased representation; and (2) he faces a serious potential conflict because he legitimately may be called as a witness by the United States or a co-Defendant at trial, and, if called, his testimony could potentially inculpate his client.

As to the actual conflict, it remains unknown at this point in time whether Mr. Neff's conduct was innocent or intentional.[9]  However, given the mere possibility that he may face criminal or professional misconduct charges, it is certainly plausible that Mr. Neff could be consumed by his own self-preservation in proceeding forward as counsel, rather than focusing on his client's defense and serving as a zealous advocate.  Indeed, as noted by the Kolodesh Court, the Government need not provide direct evidence tying Mr. Neff to impropriety or criminal conduct, "as long as it provides evidence from which a fact finder could reasonably infer that [counsel] was involved in or had

---

[9] To be clear, the Court makes no finding as to whether Mr. Neff's conduct was criminal or improper. The Government has not charged Mr. Neff with any criminal activity, and Assistant U.S. Attorney R. David Walk, Jr. indicated at Oral Argument that, based on the present record, the United States did not intend to do so at this time.

intimate knowledge of" the defendant's criminal conduct. Kolodesh, 2012 WL 1156334 at *6 (citing Zepp, 748 F.2d at 136). Accordingly, "[i]n circumstances such as these, when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces potential liability for those charges, he has an actual conflict of interest." Id. at 136 (citing United States v. Crockett, 506 F.2d 759 (5th Cir. 1980)) (further citation omitted).

Furthermore, even if an actual conflict did not exist, the United States has nonetheless met its burden in showing that Mr. Neff likely faces a serious potential conflict of interest with respect to his conceivable role as a witness at trial. It is more than possible that the Government or a co-Defendant may call Mr. Neff to testify about his conduct and statements at the December 2010 meeting with the VO Group employees. Should Mr. Neff take the stand, his testimony has the potential to directly inculpate his client, and thereby seriously undermine the effectiveness of his assistance to Adam Lacerda. More specifically, if Mr. Neff testifies that he told VO Group employees that it was lawful to use the revised scripts after the FBI search, this inherently implies, and is therefore some evidence, that the prior versions of the scripts drafted by Adam

Lacerda were, in fact, unlawful.  Certainly such testimony would not be in his client's best interest.  In any event, even if Mr. Neff is not called as a fact witness at trial, his presence, advice to, and interaction with VO Group principals and employees renders him an unsworn witness to certain portions of the charged conspiracy — a fact that will thwart the search for the truth at trial.  See Nix v. Whiteside, 475 U.S. 157, 166 (1986) ("[T]he very nature of a trial [i]s a search for truth.").

Further, regardless of whether Mr. Neff himself takes the stand at trial, other witnesses testifying on behalf of co-Defendants or the United States may nonetheless call his representation into question by asserting that they relied on the advice of legal counsel when committing acts in furtherance of the conspiracy that they believed were lawful based on Mr. Neff's statements.  The United States has introduced evidence which shows that, at the December 2010 meeting at the VO Group's offices, Mr. Neff allegedly informed company employees that he was an attorney that represented the head of the company, that the employees' conduct was not at issue because the FBI probe focused solely on the Lacerdas, and that the content of the sales pitch scripts revised after the search was lawful.  At Oral Argument, the Defense emphasized that Mr. Neff made clear

21

that he represented Adam Lacerda — not the company — during the alleged meeting, and the employees were therefore on notice that Mr. Neff was not rendering legal advice to them in his capacity as an attorney.  The Court, however, does not find the situation to be so clear-cut.  Given that Mr. Neff, the attorney representing the head of the company, spoke about a topic applicable to all VO Group employees at the company's offices in the presence of a private investigator, it would not be surprising that one or more employees may have mistakenly believed that he was providing legal advice to them or applicable to them and acting with their — or at least the company's — best interest in mind.  Indeed, regardless of whether Mr. Neff specifically stated that he was "Adam Lacerda's attorney," the average layperson may have difficulty differentiating between representation of the head of the company and the company and its employees as a whole in this context.[10]

---

[10]  It appears that Mr. Neff's actions may have presented a potential "indirect Upjohn" situation of sorts. According to the Supreme Court's holding in Upjohn Company v. United States, 449 U.S. 383 (1981) and its progeny, corporate counsel must advise company employees that it represents the company, not the individual employee, and that the company therefore is the holder of the attorney-client privilege. Thus, any information disclosed by an individual employee to corporate counsel is not subject to the privilege.

Here, Mr. Neff was retained to represent Adam Lacerda. As such, his duty is to Adam Lacerda, and Adam Lacerda

Such a situation lends to a defense that VO Group employees believed that their actions going forward were lawful based on the advice of an attorney.  Accordingly, should a co-Defendant raise the advice of counsel defense at trial and the fact-finder accepts it, Mr. Neff's representation of his client will be impaired since the attorney-client privilege is waived "with respect to all communications, whether written or oral, to or from counsel concerning the transaction for which counsel's advice was sought." Thompson v. Glenmede Trust Co., No.Civ.A.92-5233, 1993 WL 524836, at *1 (E.D. Pa. Dec. 14, 1993) (internal citation omitted). If such an instance were to occur, Mr. Neff's effectiveness as Adam Lacerda's counsel would certainly be undermined since their otherwise privileged communications could be revealed or questioned.  As such, the possibility

---

therefore is the holder of the attorney-client privilege. At the December 2010 meeting at the VO Group offices, Mr. Neff met with a group of employees and potentially advised them as to the lawfulness of conduct within the company's usual course of business, *i.e.,* the adherence to sales pitch scripts in soliciting business for the VO Group. Given the unclear circumstances surrounding Mr. Neff's role at the meeting and the significant possibility that VO Group employees may have inferred him to be corporate counsel, it is plausible that these same employees may have believed that any information they disclosed to him at that time was privileged. Since Mr. Neff was not corporate counsel, however, such information is not protected by the privilege, and would be discoverable if need be. Accordingly, the possibility of the disclosure of any such information, and Mr. Neff's role in obtaining it, further weighs in favor of his disqualification.

that a co-Defendant may assert the advice of counsel defense at trial further evinces why Mr. Neff's continued representation of Adam Lacerda in this matter would not be free of conflict.

Therefore, based on the above, the Court finds that the United States has met its burden in establishing that Mr. Neff suffers or is likely to suffer a serious conflict of interest under the present circumstances.

### 2. Substantial Hardship for Defendant

Prior to disqualifying counsel, the trial court must balance the defendant's Sixth Amendment right to counsel of his choice against the fair and proper administration of justice. Voight, 89 F.3d at 1074 (3d Cir. 1999). The Third Circuit has previously recognized that a defendant's "choice of counsel is not to be dealt with lightly or arbitrarily. That choice should not be interfered with in cases where potential conflicts of interest are highly speculative." United States v. Flanagan, 679 F.2d 1072, 1076 (3d Cir. 1982); see also United States v. Reeves, Crim.No.11-520, 2011 WL 6028000, at *8 (D.N.J. Dec. 2, 2011) (Simandle, J.). The Third Circuit has likewise noted, however, that "the potential for serious conflicts [of interest] is a consideration of judicial administration that can outweigh a defendant's right to counsel of choice." Voigt, 89 F.3d

at 1075 (citing <u>Wheat</u>, 486 U.S. at 163; <u>Moscony</u>, 927 F.2d at 750; <u>Davis v. Stamler</u>, 650 F.2d 477, 480 (3d Cir. 1981)).  Therefore, having determined above that an actual or potential serious conflict exists or may eventually manifest itself in this case, the Court must next consider whether Mr. Neff's conflict outweighs Defendant's constitutional right to the counsel of his choice.  In so doing, one factor the Court must consider is whether Adam Lacerda would suffer a substantial hardship from the disqualification of his present counsel.

The Defense maintains that Adam Lacerda would be substantially prejudiced if Mr. Neff was disqualified at this point in time.  In support of this argument, the Defense notes that Mr. Neff has represented Mr. Lacerda since 2010, and has dedicated many hours and significant effort toward his defense and trial strategy.  The Defense thus avers that it would be "virtually impossible" to find adequate substitute counsel that could replicate this knowledge base within three months of trial.

While the Court is certainly sympathetic to the amount of work and time Mr. Neff has dedicated to his client's defense, it finds that the degree of seriousness of Mr. Neff's conflicts at issue here outweigh the hardship that would be imposed upon Adam Lacerda.  Although the trial

date for this case is approaching, the Court is convinced
that there is more than enough time for Mr. Neff's co-
counsel to prepare for trial. Indeed, Adam Lacerda retained
Mr. Mark E. Cedrone, Esq. to represent him with respect to
the instant proceedings.  Despite not being involved from
the beginning stages of this case, Mr. Cedrone presented a
detailed knowledge of the facts and competently represented
Adam Lacerda at the oral argument on February 6, 2013 and
appeared at earlier proceedings in which the issue of the
Mr. Neff's potential conflict was discussed.  Mr. Lacerda's
counsel has known of this issue for some time and was
warned by the Court to anticipate the possibility of
disqualification.  Thus, given the speed and ability with
which Mr. Cedrone has been able to catch up, his earlier
involvement in this case, and the notice provided to Mr.
Lacerda of the substantial issues raised in the
government's motion, the Court has no trouble determining
that Mr. Lacerda will have competent and informed counsel
to represent him going forward.

### 3. Likelihood of Harm to Co-Defendants, the United States, and the Court

In determining whether the United States has overcome
the presumption in favor of Adam Lacerda's right to counsel
of his choice, the Court must likewise consider the

interests of the other parties and entities involved here —
namely, co-Defendants, the Government, and the Court
itself.

With respect to Adam Lacerda's co-Defendants, the Court
finds that they could be harmed since Mr. Neff may have become
privy to certain inculpatory information during the December
2010 meeting, thereby affording Mr. Lacerda an unfair advantage
at trial.  The Kolodesh Court placed significant emphasis on
this point, stating that the attorney's role in that case "may
have give[n] Defendant an unfair advantage because [counsel] in
opening and closing arguments or in cross-examination of
witnesses could impart to the jury his first-hand knowledge
concerning [the information], while framing it as a legal
argument or in the form of questions.  In doing so, [counsel]
could provide Defendant's version of the facts without being
subject to cross-examination." Kolodesh, 2012 WL 1156334, at *8.
The same concerns are echoed here.  Any inculpatory information
that may have been disclosed to Mr. Neff during the meeting may
unfairly assist him in Adam Lacerda's defense by attempting to
shift blame onto co-Defendants. The American judicial system
seeks to avoid such a de-leveling of the legal playing field.
See United States v. Cronic, 466 U.S. 648, 655 (1984).  Thus,
the possibility that Adam Lacerda may gain an unfair advantage
at the expense of his co-Defendants due to Mr. Neff's personal

27

knowledge further counsels against his continued retention as defense counsel.

Similarly, the Government likewise has a right to pursue competent, informed, and zealous advocacy on behalf of its client, the United States of America, and Mr. Neff's continued presence may disrupt the balance that should exist on both sides of the courtroom at a criminal trial. Indeed, the Supreme Court has recognized that, "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." Id. at 655 (quoting Herring v. New York, 422 U.S. 853, 862 (1975)); see also United States v. Fulton, 5 F.3d 605, 612 (2d Cir. 1993). As a result of his actions here, Mr. Neff may have obtained previously undisclosed information under false or misleading circumstances that could be unfairly advantageous to his client's defense at trial. To the extent such information exists, Mr. Neff could potentially utilize it at the expense of the United States. If permitted to do so, the basic fairness principles rooted at the core of the judicial process in criminal proceedings would be eviscerated. See Cooper v. Oklahoma, 517 U.S. 348, 349 (1996) (acknowledging "the basic fairness of the trial itself"); Huddleson v. City of Pueblo, C.O., 270 F.R.D. 635, 636 (D. Colo. 2010). Accordingly, the harm that may result to the Government from Mr. Neff's

continued representation of Adam Lacerda likewise supports a finding of disqualification.

As to the role of the Court, it has been recognized that "[f]ederal courts have an independent interest in ensuring criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them[.]" Wheat v. United States, 486 U.S. 153, 160 (1988)); see also Huddleson, 270 F.R.D. at 636. Thus, if an actual or serious potential conflict is present, the Court should attempt to eliminate it so as to preserve the integrity of the judicial process. Furthermore, the Third Circuit has likewise noted that district courts should be motivated to eliminate potential conflicts of interest in pursuit of their "legitimate wish . . . [to have] their judgments remain intact on appeal." United States v. Voigt, 89 F.3d 1050, 1078 (3d Cir. 1996) (internal citation omitted). If the Court were to disregard a potential conflict of interest that it had the ability to prevent now, it opens itself to the possibility of post-conviction collateral attack and appeal. Although certainly not a dispositive factor in the Court's decision-making process here, it is within the Court's — and the overall judicial system's — best interest to quash this problem before it even has the possibility of manifesting itself.

As such, based on the potential harmful effects that may be felt by Adam Lacerda's co-Defendants, the Government, and the Court, these factors likewise weigh in favor of the disqualification of Mr. Neff.

### B. Whether a Waiver or Other Curative Measure is Appropriate Under the Circumstances

Upon finding that an attorney's representation of his client is limited by a conflict of interest, "the Court is obligated to examine whether a waiver is feasible under the circumstances and the validity and effectiveness of any waivers submitted to cure the identified conflicts of interest." United States v. Kolodesh, Crim.No.11-464, 2012 WL 1156334, at *8 (E.D. Pa. Apr. 5, 2012) (citing Virgin Islands v. Zepp, 748 F.2d 125,131 (3d Cir. 1984)). The Third Circuit has recognized, however, that district courts have "substantial latitude in refusing waivers of conflicts of interest[.]" Voigt, 89 F.3d at 1077 (internal citation omitted).

The Defense asserts that, even if Mr. Neff suffers from a conflict of interest here, any such conflict is nonetheless waiveable or could be eliminated by a limiting evidentiary instruction at trial. Indeed, Adam Lacerda avers that he has met with separate counsel and is willing to waive his right to call Mr. Neff as a witness and will, if necessary, agree to a colloquoy on the record. In support of its position, the

Defense extensively relies on a decision by our sister court in the Eastern District of Pennsylvania, United States v. Fumo, 504 F.Supp.2d 6 (E.D. Pa. 2007).

In Fumo, the government moved to disqualify the attorney and law firm retained by former Pennsylvania state senator Vincent J. Fumo to represent him with respect to his criminal charges for fraud, obstruction of justice, and criminal conspiracy. The government alleged that disqualification was necessary because defense counsel previously represented several of the victim entities in the case and therefore likely obtained confidential information, were witnesses to several pertinent events charged in the indictment, and could potentially be placed in the position of defending the propriety of their conduct. Id. at 25. The court, however, found that, "the majority of the conflicts presented by the government [were] relatively minor in nature, [were] basically uncontested, and [could] be cured through a waiver colloquy with Fumo." Id. at 33. In so finding, the court emphasized that the government conceded that it had no evidence which indicated that the firm had personal knowledge of, was blind to, or participated in the alleged improper and criminal conduct at issue. Id. The court also placed emphasis on the fact that, "both sides have made clear that they do not intend to call [the attorney] or any member of [his] firm as a witness." Id. at 34, 36.

Here, the Defense argues that the circumstances in the <u>Fumo</u> case are substantially similar to those in the instant matter. <u>Fumo</u>, however, is readily distinguishable. Notably, the issues here are not relatively minor or largely undisputed as they were in <u>Fumo</u>. To the contrary, they appear to be significant and hotly contested between the parties. Further, unlike the prosecution in <u>Fumo</u>, the Government here has introduced evidence indicating that counsel may have had personal knowledge of or even possibly participated in improper or criminal conduct.[11]

---

[11] The Defense asserts that the evidence upon which the Government bases its Motion is unreliable. Specifically, the Defense asserts that Mr. Neff's statements constitute hearsay. The Defense further avers that there are factual discrepancies amongst the content of the FBI 302s, and that one witness has even retracted his prior statement that he spoke to an attorney other than his own retained counsel.

The Court, however, is unconvinced by these arguments. First, Mr. Neff's statements are likely not hearsay, as they are not being offered for the truth of the matter asserted, *i.e.*, that the post-search scripts were lawful, but rather are admissions as to other matters (the legality of the pre-search scripts) or are offered to show the effect they had on company employees and continuation of the conspiracy. Indeed, the Government seeks to prove that the core statements are false. Second, while minor discrepancies may exist regarding the contents of the different FBI 302 statements, such small differences are insufficient to render them "unreliable evidence." In fact, federal courts routinely rely on statements made in proffer sessions and investigative reports in resolving pre-trial disputes in criminal matters. <u>See</u> <u>Kolodesh</u>, 2012 WL 1156334 at *2 (partially relying on witness's 302 statement in attorney disqualification case); <u>United States v. Napoli</u>, Crim.Nos.08-1665 & 08-4193, 2011 WL 1302317, at *3-4 (N.D. Cal. Apr. 11, 2007)(basing disqualification ruling on proffer statements and investigative reports); <u>United States v. Mayfield</u>, 361 F. App'x 425 (3d Cir. 2010)(relying on statements made by defendant in proffer session in admissibility of

Furthermore, and perhaps most importantly, the government, Fumo, and his co-defendant all agreed that they would not call counsel in question as a witness at trial.  In direct contrast, the Government here has represented to the Court that it may call Mr. Neff as a fact witness at trial.  It is also more than possible that one of Adam Lacerda's co-Defendants may call Mr. Neff as a witness to attest to his statements at the December 2010 meeting at the VO Group.  Further, it is unlikely that any of the co-Defendants will waive their right to call Mr. Neff when his testimony may lend significant credibility to an advice of counsel defense.  As such, even though Adam Lacerda himself may agree to waive the conflict, this waiver does not prevent Mr. Neff from nonetheless being called to take the stand and testify to his client's detriment.

Furthermore, although Adam Lacerda may presently agree to waive Mr. Neff's conflict of interest, there is still the possibility that he may reconsider his decision at a later point in time and choose to assert an advice of counsel defense. Indeed, Fumo itself is an example of such a recantation. Despite previously agreeing to waive any conflict of interest and engaging in a waiver colloquy with the court to this effect, Fumo subsequently changed his mind and opted to pursue an advice

---

evidence dispute).  As such, Defendant's arguments on these grounds are without merit.

33

of counsel defense. [See E.D. Pa. Case No. 06-319, Docket No. 162 ("[T]he court having been advised on this date that defendant Vincent J. Fumo will not waive the conflicts of interest that have been alleged . . .").] Having been placed in this difficult position, Fumo's counsel moved to voluntarily withdraw from further representation, and the court granted the request. [See id.; Docket Nos. 161 & 162.] As such, while the Defense here extensively relies on the district court's initial opinion in Fumo as direct support for its position, the subsequent procedural history of that case actually undercuts its position. Indeed, as evidenced by the history of the Fumo case, it would be better to eliminate a potential conflict by disqualifying Mr. Neff now, rather than facing the possibility that a conflict may arise even closer to trial, or, even worse, during the trial itself.

Given the breadth and depth of the kind of conflicts involved here, coupled with the fact that the effectiveness of a waiver under these circumstances is significantly questionable, the Court finds Mr. Lacerda cannot waive the conflict here. In so holding, the Court finds itself in the company of numerous other federal courts. See Kolodesh, 2012 WL 1156334 at *8-9; United States v. Reeves, Crim.No.11-520, 2011 WL 6028000, at *6 (D.N.J. Dec. 2, 2011) (citing Wheat, 486 U.S.at 160); United States v. Massimino, 832 F.Supp.2d 510 (E.D. Pa. 2011); United

34

States v. Fulton, 5 F.3d 605, 613 (2d Cir. 1993) ("[W]e are unable to see how a meaningful waiver can be obtained. The conflict here involves a bias arising out of counsel's powerful self-interest in avoiding criminal charges or reputational damage and is thus of a different character than other conflicts.").

During Oral Argument before the Court on February 6, 2013, Defense counsel indicated that, in the event that the Court finds a waiver inappropriate, any conflict could nonetheless be cured through the use of an evidentiary limiting instruction at trial. According to the Defense, the instruction would permit witnesses to testify about Mr. Neff's statements at the December 2010 meeting, but would preclude them from directly identifying him as the speaker and instead require them to merely refer to "Mr. Lacerda's attorney." The Court is unconvinced that such a limiting instruction would be helpful or remedial here. Rather, such testimony would only be likely to confuse the jury and cloud the fact-finding process. See e.g., Kolodesh, 2012 WL 1156334 at *8 ("Even if he remained silent at counsel's table, the jury would be left to wonder why [counsel], who had first-hand knowledge of relevant events . . . did not testify at trial.").

Finally, the Court considers Defense counsel's suggestion to hold an evidentiary hearing to conduct a further inquiry into

whether the statements made by the four witnesses at issue will mirror their prospective testimony at trial.  The Court does not believe such a hearing is necessary.  Even if the witnesses' testimonies at such a hearing were to contradict their statements in the FBI 302s, this will not preclude the Government from introducing their prior statements at trial for impeachment purposes.  Indeed, if the Court holds such a hearing, it may unintentionally veer into the territory of assessing the reliability of the witness — an area solely within the province of the jury.  Thus, the request for a hearing is denied.

**IV. CONCLUSION**

For the reasons set forth above, the Court finds that the Government has satisfied its burden in showing that Mr. Neff faces or is likely to face a significant conflict of interest under these circumstances.  The Court further finds that such conflicts cannot be waived, nor cured through alternative remedial measures.  Accordingly, the Government's Motion to Disqualify Mr. Neff from further representation of Adam Lacerda in this matter is granted.

An appropriate Order follows.

*/s/ Noel L. Hillman*
_____

At Camden, New Jersey               NOEL L. HILLMAN, U.S.D.J.

Dated: 03/07/2013

36