_____

UNITED STATES OF AMERICA,           :
                                    :
          Plaintiff,                :     Crim. No. 12-303 (NLH/AMD)
                                    :
     v.                             :
                                    :
ADAM LACERDA, a/k/a "Robert         :
Klein," *et al.*,                   :              **OPINION**
                                    :
          Defendants.               :
_____     :

**HILLMAN, District Judge**:

     Presently before the Court are the parties' various pre-trial motions.  Trial in this matter is set to commence on July 8, 2013.  The Court held a pre-trial hearing on June 13, 2013. At the hearing, the Court orally ruled from the bench on some of the motions, and reserved judgment on other issues contained in the motions.  This Memorandum Opinion and its accompanying Order serve to resolve all issues related to the parties' pre-trial motions.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

     The facts of this case are familiar to all parties, and the Court therefore need not provide a full factual recitation here. In short, the Defendants in this criminal proceeding are charged with devising and executing a scheme to defraud timeshare owners of their money and property through a business entity known as

the Vacation Ownership Group ("VO Group").[1]  Several Defendants

are also charged with committing unemployment fraud by allegedly

failing to report income from the VO Group while collecting

unemployment benefits from the New Jersey Department of Labor

("NJDOL").

On May 14 and 17, 2013, Defendants Adam Lacerda, Ashley

Lacerda,[2] Joseph DiVenti, Ian Resnick, and Genevieve Manzoni

filed various pre-trial motions seeking to resolve certain

issues in advance of the July 8, 2013 trial date.[3]  [Docket Nos.

154, 156, 157, 158, 159, 162.]  The United States filed a Brief

in Opposition on May 28, 2013.  [Docket No. 166.]  Defendant

Manzoni filed a Reply on May 31, 2013.  [Docket No. 169.]  The

United States then sought and obtained the Court's permission to

file a Sur-reply to Manzoni's Reply [Docket Nos. 175 & 176], to

which Manzoni replied on June 7, 2013.  [Docket No. 177.]  The

---

[1]     Ten Defendants were initially indicted in this matter: Adam
Lacerda a/k/a "Robert Klein," Ashley Lacerda, Ian Resnick,
Steven Cox a/k/a "Steve Coluzzi," Alfred Giordano a/k/a "Alex
Jordan," Francis Santore a/k/a "Frank Martin," Brian Corley
a/k/a "John Corley," Joseph DiVenti, Joseph Saxon, and Genevieve
Manzoni.  To date, Defendants Cox, Giordano, Santore, Corley,
and Saxon have all entered guilty pleas before this Court.

[2]     Adam and Ashley Lacerda are married.  For purposes of
clarity, the Court will refer to them by their first names.

[3]     Defendant Resnick filed an untimely motion seeking to join
in the motions of his co-Defendants. The Court will consider
Resnick's motion along with those of the other Defendants.
Nevertheless, the Court cautions Resnick to be more diligent in
his future filings in this matter out of respect and fairness to
all parties involved.

Court held oral argument on these various motions and issues on June 13, 2013, at which time it orally ruled from the bench on certain issues and reserved judgment on others. Having now reviewed the parties' paper submissions and having had the benefit of oral argument, the Court will formally rule on the parties' motions below.

**II. DISCUSSION**

Although some issues raised in these motions are Defendant-specific, others were raised jointly or predicated upon largely similar arguments. The Court, therefore, will address the arguments made in the parties' motions on an issue-by-issue basis.

    **A. Rule 14 Severance**

Defendants Ashley Lacerda and Manzoni argue that their trials should be severed from that of their co-Defendants in this matter pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 governs the severance of defendants and counts in criminal proceedings, and provides that:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed. R. Crim. P. 14(a). Under Rule 14, a moving defendant bears the "heavy burden" of demonstrating that he would be

"substantially prejudiced" by a joint trial.  United States v.
Cotona, Crim.No.07-26, 2007 U.S. Dist. LEXIS 78375, at *4
(D.N.J. Oct. 22, 2007)(citing United States v. DiPasquale, 740
F.2d 1282, 1293 (3d Cir. 1984)); see also United States v.
Espinosa, Crim.No.07-482, 2009 U.S. Dist. LEXIS 5913, at *8
(E.D. Pa. Jan. 27, 2009).  According to the United States Court
of Appeals for the Third Circuit, in order for a defendant to be
granted severance under Rule 14, he must point to "clear and
substantial prejudice" that would result in a manifestly unfair
trial.  United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir.
1991).  Indeed, mere allegations of prejudice are insufficient
to meet the heavy burden, as the defendant must indicate more
than the fact that a separate trial may offer him a better
chance of acquittal.  Espinosa, 2009 U.S. Dist. LEXIS 5913 at *8
(internal citations omitted).  The ultimate decision of whether
to sever defendants rests with the sound discretion of the trial
court.  United States v. Boyd, 595 F.2d 120, 125 (3d Cir. 1978).
In exercising this discretion, trial courts should weigh the
potential undue prejudice to the defendant against the interests
of judicial economy and any potential prejudice to the
government.  United States v. Sandini, 888 F.2d 300, 305 (3d
Cir. 1989).  Moreover, the Supreme Court of the United States
has previously recognized that "a district court should grant a
severance under Rule 14 only if there is a serious risk that a

joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Zafiro, 506 U.S. 534, 539 (1993).

### 1. Defendant Ashley Lacerda

Ashley argues that her involvement in the charged criminal scheme was very limited, and that, absent a severance, she will be unable to present a complete defense. (Ashley Lacerda Br. at 3-4.) In support of her motion, Ashley attaches a Declaration from her husband and co-Defendant, Adam Lacerda, in which he states that he would provide exculpatory information on her behalf if she were tried separately. More specifically, Adam states in the Declaration that he is likely to invoke his Fifth Amendment privilege against self-incrimination in the instant trial where they are co-Defendants, but "believe[s] [he] can provide helpful and exculpatory evidence" if Ashley's case proceeds to trial separately after his. (Id., Ex. A, Decl. of Adam Lacerda.) Adam declares that he would testify at Ashley's trial that, despite her status as a co-owner of the VO Group, her role in the company was limited to secretarial and administrative actions, and that she played no direct role in making sales calls or acting as a sales person in furtherance of the scheme. (Id.) Based on these statements, Ashley argues that Adam's testimony in and of itself would create a reasonable

doubt as to her guilt at a trial, and that she will be deprived
of her right to present exculpatory evidence if forced to
proceed to trial jointly.  (Ashley Lacerda Br. at 4.)

In United States v. Boscia, 573 F.2d 827 (3d Cir. 1978),
the Third Circuit enumerated four factors for district courts to
consider when a defendant seeks severance on the grounds that a
co-defendant may provide exculpatory testimony in a severed
trial:

> (1) The likelihood of the co-defendant testifying; (2)
> the degree to which such testimony would be
> exculpatory; (3) the degree to which the testifying
> co-defendant could be impeached; and (4) judicial
> economy.

Id. at 832; United States v. Gonzalez, 918 F.2d 1129, 1137 (3d
Cir. 1990).  It has previously been recognized that severance
pursuant to the Boscia factors is an extremely rare occurrence
within this Circuit.  See United States v. Done, Crim.No.09-601,
2011 U.S. Dist. LEXIS 103739, at *15 (D.N.J. Sept. 6, 2011).

As to the first Boscia factor — the likelihood of the co-
defendant testifying — Ashley avers that, "there is no question
that if [her] trial is severed and conducted after Adam
Lacerda's trial, he will testify for her, regardless of the
outcome of his trial.  No one can predict, and the court should
not speculate or gamble that Adam Lacerda will testify at a
joint trial."  (Ashley Lacerda Br. at 4.)  In response, the
United States asserts that the law requires Ashley to make a

"strong showing" that Adam would in fact testify on her behalf at a separate trial, and that her present assertions do not fulfill this prerequisite.  (USA Br. at 9.)  In support of its argument, the United States points to the fact that Adam's Declaration is riddled with conditional language that smacks of bad faith, and that courts have routinely rejected such uncertain severance requests.  (Id. at 10-12.)

It has previously been expressly recognized that a co-defendant's offer to testify premised upon his being tried first does not satisfy the first Boscia factor.  See United States v. Bates, 46 F. App'x 104, 109 (3d Cir. 2002); Done, 2011 U.S. Dist. LEXIS 103739 at *15 (citing United States v. Reavis, 48 F.3d 763, 767-68 (4th Cir. 1995)); United States v. Spinelli, 352 F.3d 48, 56 (2d Cir. 2003); United States v. Blanco, 844 F.2d 344, 353 (6th Cir. 1988)); see also United States v. Cooya, Crim.No.08-70, 2012 U.S. Dist. LEXIS 57239, at *8 (M.D. Pa. Apr. 24, 2012).  Indeed, "[a]n offer to testify premised on the testifying co-defendant being tried first does not satisfy this requirement because it is premised on the co-defendant making a later determination of whether and how to testify after assessing his own interests and risks consequent to his own trial fate."  Done, 2011 U.S. Dist. LEXIS 103739 at *15.  Here, Adam's offer to testify on Ashley's behalf is premised on the condition that he be permitted to proceed to trial first.  (See

Ashley Lacerda Br. at 4 ("[T]here is no question that if Ashley Lacerda's trial is severed and conducted *after* Adam Lacerda's trial, he will testify for her, regardless of the outcome of his trial.")(emphasis added)).  Although Adam may presently aver that he would testify on Ashley's behalf at a separate trial, it remains a very real possibility that he may subsequently elect not to do so in light of a potential appeal, the chance if convicted that his testimony with have sentencing and sentencing guidelines ramifications in his own case, the chance of facing additional criminal liability, or being subject to cross-examination about his own criminal activity and knowledge of his wife's actions in furtherance of the fraudulent scheme.[4] Furthermore, if Ashley's severance request was granted, this would tie the hands of the court and allow "alleged co-conspirators to control the order in which they are tried." Blanco, 844 F.2d at 353.

Moreover, as pointed out by the United States, Adam's offer to testify on his wife's behalf at a separate trial appears to be largely conditional.  (USA Br. at 10-12.)  His Declaration is peppered with provisional and noncommittal language, stating that he is "likely" to invoke his Fifth Amendment privilege at a

---

[4]    Indeed, when questioned at oral argument about the likelihood of Adam testifying on Ashley's behalf if he were convicted and awaiting sentencing during Ashley's trial, counsel admitted that Adam would be unlikely to take the stand under such circumstances.

joint trial and that he "believe[s]" he could provide "helpful" exculpatory evidence for Ashley in a separate trial, but would be "unlikely" to do so in a joint trial. (Ashley Lacerda Br., Ex. A, Decl. of Adam Lacerda.) He also declares that, if he testifies on Ashley's behalf at a separate trial, he would indicate that she worked "mostly in an administrative or secretarial capacity . . . [a]t most times alleged in the Indictment," and that she "was not generally involved on a full-time basis." (Id.)(emphasis added). These statements do not evince a certain commitment, but instead indicate that Adam may later testify at Ashley's subsequent trial if he determines that the benefit of doing so would outweigh any risks to himself. Such uncertain statements in affidavits and declarations filed in support of co-defendant severance requests have previously been rejected by other courts within this District. See Done, 2011 U.S. Dist. LEXIS 103739 at *15. Accordingly, the first Boscia factor weighs against severance here.

The second Boscia factor considers the degree to which a co-defendant's testimony would be exculpatory. Ashley argues that, at a separate trial, Adam would testify, as noted above, that her part in the VO Group enterprise was limited to administrative and secretarial work, and that she therefore played little to no role in the execution of the charged conspiracy. (Ashley Lacerda Br. at 5.) As pointed out by the

Government, however, the statements in Adam's Declaration actually support a finding that his proffered testimony would have marginal exculpatory value, and may, in fact, be inculpatory. (USA Br. at 12-13.) The Indictment in this matter[5] charges Ashley with a conspiracy to commit mail and wire fraud, substantive counts of mail and wire fraud, conspiracy to commit money laundering, substantive counts of money laundering, and unemployment fraud through interstate wire transactions. In his Declaration, Adam blatantly admits that Ashley "assisted and worked for VO Group," and that she emailed contracts to purported company customers. (Ashley Lacerda Br., Ex. A, Decl. of Adam Lacerda.) Thus, Adam's statements essentially admit that Ashley was working at the time that she collected unemployment from the NJDOL, and that she committed mail and wire fraud in furtherance of the timeshare fraud conspiracy by e-mailing purported contracts to victims and doing other facilitative tasks. Even if her actions were minimal in comparison to other Defendants, they nonetheless constitute actions in furtherance of an alleged criminal conspiracy. As such, the second Boscia factor weighs heavily against severance.

The third factor requires the Court to consider the degree to which the testifying co-defendant could be impeached. Ashley

_____

[5]    A superseding indictment was filed on January 23, 2013. [Docket No. 79.]

asserts that this factor weighs in favor of severance because Adam has no prior history of criminal convictions. (Ashley Lacerda Br. at 5.) The United States disagrees, urging that Adam's testimony on Ashley's behalf would be "devastated" by impeachment because his relationship with Ashley is fundamentally compromised as a result of their marital status, and, if found guilty at his own trial, his conviction would significantly undermine his credibility at Ashley's subsequent trial. (USA Br. at 14.) "It is well-settled that if a co-defendant's proposed testimony lacks sufficient exculpatory content or would suffer from serious credibility problems at trial, severance is not required." Cooya, 2012 U.S. Dist. LEXIS 57239 at *22 (citing United States v. Powell, 982 F.2d 1422, 1433 (10th Cir. 1992)). Courts in this District have previously recognized that a familial relationship provides grounds for impeachment in the severance context because "[t]hese relationships alone suggest bias and a motive to fabricate." Done, 2011 U.S. Dist. LEXIS 103739 at *18. Adam and Ashley's marital status therefore tends to weigh against severance here. Since it remains unknown at this time, however, whether Adam would actually be convicted at his trial, it likewise remains unclear whether his testimony at Ashley's trial would be fundamentally undermined on this basis. Furthermore, as pointed out by Ashley, he has no prior criminal convictions upon which

his credibility could otherwise be impeached.  On balance, the third Boscia factor is neutral, neither weighing strongly in favor of or against severance here.

The final Boscia factor instructs the Court to consider interests of judicial economy.  It goes without saying that one trial is certainly more economical than two (or, in this case, possibly three or four), particularly when involving common subject matter.  The Supreme Court and our Court of Appeals have both recognized a "strong preference" that defendants named in a single indictment be tried together so as to "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."  United States v. Lane, 474 U.S. 438, 449 (1986); United States v. Jimenez, 513 F.3d 62, 82 (3d Cir. 2008). Furthermore, the Third Circuit very recently echoed that, "[p]articipants in a single conspiracy should ordinarily be tried together for purposes of judicial efficiency and consistency, even if the evidence against one is more damaging than that against another."  United States v. Kaur, App.No.12-1795, 2013 U.S. App. LEXIS 8298, at *4 (3d Cir. Apr. 24, 2013)(citing United States v. Ward, 793 F.2d 551, 556 (3d Cir. 1986)).  In a similar vein, multiple protracted trials that share a common subject matter — particularly in a case of this magnitude — would be burdensome and wasteful for the Government

in putting on and proving its case.  Thus, the fourth factor weighs strongly against severance.

Accordingly, in applying the four factors set forth by the Court of Appeals in Boscia to the present circumstances, it is evident that severance of Ashley Lacerda is unwarranted.  Her motion to sever pursuant to Rule 14 will therefore be denied.

## 2. Defendant Genevieve Manzoni

Defendant Manzoni likewise asserts that her trial should be severed from her co-Defendants under Rule 14 on the basis that her role in the alleged fraudulent scheme was fundamentally different than that of the other Defendants.  (Manzoni Br. at 15-16.)  More specifically, Manzoni alleges that she is less culpable than her co-Defendants because she was outside the "core VO Group" and merely followed a script provided to her, and that her independent unemployment fraud charge — when considered alongside the other Defendants' unemployment fraud charges — would inevitably lead a jury to presume that there was some illegal concerted activity.  (Id. at 16.)

As indicated above, under Rule 14, a defendant requesting severance bears the "heavy burden" of demonstrating that he would be "substantially prejudiced" by a joint trial.  United States v. Cotona, Crim.No.07-26, 2007 U.S. Dist. LEXIS 78375, at *4-5 (D.N.J. Oct. 22, 2007)(citing United States v. DiPasquale, 740 F.2d 1282, 1293 (3d Cir. 1984)).  In exercising its

discretion, the court must weigh any potential undue prejudice to the defendant against the interests of judicial economy and prejudice to the government.  United States v. Sandini, 888 F.2d 300, 305 (3d Cir. 1989).[6]

Our sister court in the Eastern District of Pennsylvania addressed a similar situation in United States v. Fumo, Crim.No.06-319, 2008 U.S. Dist. LEXIS 1803 (E.D. Pa. Jan. 9, 2008).  In that case, former Pennsylvania state senator Vincent J. Fumo was charged with fraud, obstruction of justice, and criminal conspiracy related to his misuse of state funds for his personal benefit.  Id. at *2.  More specifically, the indictment charged Fumo with the execution of separate schemes to defraud the Pennsylvania Senate, a non-profit organization, and a museum in Philadelphia.  Id.  The indictment likewise charged Fumo with engaging in a separate tax fraud scheme.  Id.  Indicted alongside the senator were his former legislative aides and staff members Mark Eister, Leonard Luchko, and Ruth Arnao for their roles in the alleged conspiracies and obstruction of justice.  Id. at *1.  Eister and Luchko moved to sever themselves from Fumo under Rule 14, arguing that they played minor or different roles in the schemes than Fumo did, and that

---

[6]     Since Manzoni does not seek a severance on the grounds that a co-Defendant may provide exculpatory testimony on her behalf in a severed trial, the Boscia factors do not apply to her severance motion.

their joinder as defendants was highly prejudicial and affected their ability to obtain a fair trial. Id. at *12-13. Eister and Luchko specifically asserted that: (1) the charges against them were not sufficiently related to the charges against Fumo; (2) the spillover effect of a joint trial would artificially link them, in the eyes of the jury, to the frauds with which Fumo was charged, but with which they were not charged; and (3) they would have to sit through a lengthy trial when all the claims against them could be tried in under two weeks. Id. at *12. The court disagreed with Eister and Luchko, finding that principles of logic and judicial economy favored all the defendants being tried jointly:

> In the instant case, the presumption of trying alleged co-conspirators together, supported by principles of judicial economy, outweighs Eister's and Luchko's concerns. Neither Eister nor Luchko argues that evidentiary issues are relevant to the decision whether to sever this trial. Even if they did, those arguments would be unavailing . . . [because] evidence of the charged frauds involving Fumo and Arnao would be admissible pursuant to Federal Rule of Evidence 404(b) to explain the motive for the obstruction efforts. . . . The inconvenience of a longer trial, involving multiple defendants, is not a violation of "a specific trial right." It is true that Eister and Luchko have been charged in a relatively small number of counts compared to Fumo and Arnao. But, though this case involves many charges, the schemes that form the basis of those charges are not complex. The government states that it will present its evidence in two months, which is not an unreasonably long length of time, and a substantial portion of that evidence will involve the obstruction charges. Finally, any potential spillover effect of a joint trial is insufficient to outweigh the costs of separate trials.

> Given the varied and discrete roles the different
> defendants are alleged to have played and the distinct
> and easily understandable nature of the offenses
> charged, a jury will be able to compartmentalize the
> evidence against the separate defendants. Eister and
> Luchko have not pointed to a likelihood of "clear and
> substantial prejudice" that cannot be alleviated
> through the prosecution's presentation of evidence in
> an organized manner and my instruction to the jury
> regarding its obligation to consider the evidence
> against each defendant separately.

Id. at *17-19.

Manzoni has likewise failed to satisfy her heavy burden that she will be substantially prejudiced by a joint trial. First, she merely baldly asserts that, unless her trial is severed, she "might" face the "dilemma" of refraining from taking the stand and offering exculpatory evidence in her defense. (Manzoni Br. at 15.) By way of this statement, Manzoni does not assert that she would in fact take the stand in her defense at a separate trial, nor does she indicate what kind of exculpatory evidence at trial she could potentially present in her defense. Instead, she merely alleges that she played a lesser role in the charged crimes and that her situation was "very different" from her co-Defendants such that she would be unfairly biased by a joint trial. (Id. at 15-16.) On its part, the United States proffers that it will introduce evidence that Manzoni's role was not minor, but that she was actually significantly involved in the execution of the conspiracy. (USA Br. at 16.) For example, the Government has indicated that it

will introduce evidence that she worked directly with members of the core VO Group as a company manager, and that she called on them to help her close deals in accordance with the fraudulent scheme. (Id.) In light of the Government's statements, the Court is not convinced that there will actually be as much separate and distinct evidence as Manzoni claims there would be in a joint trial. See United States v. Forde, 699 F.Supp.2d 637, 644 (S.D.N.Y. 2010)("Given the Government's representations[,] [] the Court is not convinced that there will be as much separate and distinct evidence as [Defendant] claims.").

Moreover, even if the Court were to accept as true Manzoni's assertions that she played a lesser and very different role in the conspiracy, this does not in and of itself require severance. As evidenced by Fumo, one's status as a "minor" or "different" defendant does not automatically translate into impermissible prejudice by means of joinder. Indeed, courts have previously noted that, "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance. . . . [P]rejudicial spillover warranting severance is, in general, an unlikely occurrence when all the defendants are charged under the same conspiracy count." Id. (citing United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998);

United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991)).

Accordingly, Manzoni's arguments on this point are unavailing.

Furthermore, much of the evidence that would be offered against Manzoni at a joint trial would still likely be admissible against her in an individual trial in light of the fact that she has been charged with conspiracy. See Forde, 699 F.Supp.2d at 644. For instance, Federal Rule of Evidence 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is admissible as non-hearsay. More so, much of the evidence relating to the fraudulent scheme could be admitted as background evidence for the conspiracy counts. Courts have previously recognized that the introduction of such evidence is "neither spillover nor prejudicial." Id. For example, in Fumo, the court noted that evidence of co-defendants' charged frauds could still be admitted at a separate trial to explain the motive for the fraud. Fumo, 2008 U.S. Dist. LEXIS 1803 at *18. Thus, in light of the above, the Court finds that Manzoni has not satisfied her heavy burden of showing that she will be substantially prejudiced by a joint trial.

On the other hand, the interests of judicial economy and potential prejudice to the United States are substantial here. As indicated above, separate trials with respect to the same charged conspiracy would be a significant waste of judicial time

and resources because participants in a conspiracy should ordinarily be tried together, even if the evidence against one is more damaging than it is against another. Kaur, 2013 U.S. App. LEXIS 8298 at *4. A severance here would further delay resolution of this matter, expend unnecessary funds in a time of judicial budgetary constraints, and would inconvenience judges, court staff, witnesses, potential jurors, and public authorities. Moreover, a severance would likely be very burdensome to the Government, as it would have to repeat arguments, re-admit evidence, recall certain witnesses, re-file briefing, and largely regurgitate a truncated version of its case-in-chief at a subsequent trial. Accordingly, in weighing the potential undue prejudice to Manzoni against the interests of judicial economy and prejudice to the Government, it is apparent that severance of Manzoni is unwarranted under these circumstances. Accordingly, her motion pursuant to Rule 14 shall be denied.

**B.    Rule 8 Severance**

Defendant Manzoni also argues that the charges brought against her in the Indictment should be severed from each other pursuant to Rule 8 of the Federal Criminal Rules. The Indictment charges Manzoni with one conspiracy count and one substantive count of fraud related to her role in the alleged timeshare fraud scheme (Counts 1 & 19), and one count of wire

fraud related to her alleged scheme to defraud the NJDOL by collecting unemployment benefits while she was employed at the VO Group (Count 44). Manzoni argues that the timeshare fraud scheme counts were improperly joined with the unemployment fraud charge in the Indictment and should be severed and tried separately from each other and those of the other Defendants. Her argument with respect to the severance of her claims is essentially two-fold: (1) the charges brought against her in the Indictment should be tried separately from the charges brought against other Defendants; and (2) the charges brought against her in the Indictment are distinct enough that they should be tried separately from one another. (Manzoni Br. at 2.) In other words, Manzoni asserts that the Court should hold two trials with respect to her role here: one for her role in the timeshare fraud, and the other for the unemployment fraud charges brought against her.[7]

Rule 8 of the Federal Rules of Criminal Procedure governs the joinder of offenses and defendants. Rule 8(b) provides as follows:

> (b) The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more

---

[7] These two trials, of course, would be in addition to the joint trial of the other Defendants in this matter.

counts together or separately. All defendants need not
be charged in each count.

Fed. R. Crim. P. 8(b). It is well-established in this Circuit
that Rule 8(b) governs the propriety of joinder in cases
involving multiple defendants. See United States v. Irizarry,
341 F.3d 273 (3d Cir. 2003).[8] Although Rule 8(b) has been

---

[8] There was initially some dispute between the parties as to
whether subpart (a) or (b) of Rule 8 applied here. Rule 8(a)
provides as follows:

> (a) The indictment or information may charge a
> defendant in separate counts with 2 or more offenses
> if the offenses charged--whether felonies or
> misdemeanors or both--are of the same or similar
> character, or are based on the same act or
> transaction, or are connected with or constitute parts
> of a common scheme or plan.

Fed. R. Crim. P. 8(a). At first blush it may appear as though
subpart (a) would govern here because it relates to the joinder
of offenses and the basis of Manzoni's argument is that the
timeshare fraud counts were improperly joined with the
unemployment fraud count. However, the Third Circuit explicitly
addressed the interplay and application of subpart (a) and (b)
in multi-defendant cases in United States v. Irizarry, 341 F.3d
273 (3d Cir. 2003), stating that:

> [The Defendant's] focus on Rule 8(b) at first appears
> misguided because Rule 8(b) authorizes joinder of
> defendants and [Defendant] is actually challenging the
> joinder of allegedly unrelated offenses. Therefore,
> the plain language of Rule 8 suggests that he must
> rest his claim of misjoinder on Rule 8(a). However, we
> have held that Rule 8(a) dealing with the joinder of
> offenses, applies only to prosecutions involving a
> single defendant and that in a multi-defendant case
> such as this, the tests for joinder of counts and
> defendants is merged in Rule 8(b). Moreover, most
> courts have held that Rule 8(b) applies exclusively to
> issues of joinder of multiple defendants and that Rule

interpreted to be more strict than its counterpart in subpart

(a) of the Rule, it has likewise been recognized that the "same

act or transaction" language of subpart (b) should be defined

broadly to include a "common plan or scheme."  See Fumo, 2008

U.S. Dist. LEXIS 1803 at *2 (quoting United States v. Somers,

496 F.2d 723, 729-30 (3d Cir. 1974); United States v. Haney, 914

F.2d 602, 606 (4th Cir. 1990); United States v. Guerrero, 756

F.2d 1342, 1345 (9th Cir. 1984))(internal parentheticals

omitted).  The Supreme Court has likewise recognized a

"preference in the federal system for joint trials of defendants

who are indicted together" because joint trials "promote

efficiency and 'serve the interest of justice by avoiding the

scandal and inequity of inconsistent verdicts.'"  Zafiro v.

United States, 506 U.S. 534, 537 (1993)(quoting Richardson v.

Marsh, 481 U.S. 200, 210 (1987)); United States v. Balter, 91

---

8(a) applies only in cases involving a single
defendant charged with multiple offenses. Therefore,
[Defendant's] reliance on Rule 8(b) is proper.

Id. at 287 (internal citations & quotation marks omitted).  The
Third Circuit has thus made clear that subpart (b) governs the
propriety of the joinder of claims in multi-defendant cases.
See also Fumo, 2008 U.S. Dist. LEXIS 1803 at *2 ("Rule 8 governs
joinder of both offenses and defendants. In a case with multiple
defendants, only Rule 8(b) applies.").
    Although the United States initially argued that subpart
(a) applied to the instant case, it sought permission to file a
sur-reply with the Court, in which it conceded that subpart (b)
is the governing provision here. The parties do, however,
contest whether or not the charges are properly severable under
subpart (b).

F.3d 427, 432 (3d Cir.1996)); see also United States v. Kemp,
Crim.No.04-370, 2004 U.S. Dist. LEXIS 24189, at *10 (E.D. Pa.
Dec. 2, 2004)("As the case law indicates, courts allow very
liberal joinder of charges and defendants.").

The Court first considers Manzoni's argument that the
charges brought against her should be severed and tried
separately from those brought against her co-Defendants.  She
makes this argument with respect to both her timeshare and
unemployment fraud charges, stating that: "the indictment does
not allege that [her] unemployment fraud was connected in any
way to the unemployment charges against other defendants who are
charged separately in other counts, nor does the indictment
suggest that the unemployment fraud is connected in any way with
any criminal aspect of the timeshare allegations."  (Manzoni Br.
at 2.)

Defendant Luchko made a similar argument in Fumo.  Luchko
was charged with conspiracy and obstruction of justice for his
actions in wiping clean computers and electronic devices of any
damaging evidence.  Luchko argued that his charged conduct was
distinct from Fumo's misappropriation of public funds and
conspiracies to defraud the Senate, non-profit, and museum, and
that his claims should therefore be severed and tried
separately.  2008 U.S. Dist. LEXIS 1803 at *12.  The court,
however, disagreed, finding that Luchko's conduct leant to the

larger criminal scheme and was therefore "sufficiently related to the charges against the other defendants."  <u>Id.</u> at *15 ("Because [] Luchko [is] allegedly [a] member[] of a conspiracy to obstruct justice, the charges against [him] are sufficiently related to the charges against the other defendants.  In addition, . . . it is proper to try together the obstruction charges and the underlying substantive offenses.").

The same logic applies here.  As noted above with respect to her Rule 14 severance motion, Manzoni would not be unduly prejudiced by having her conspiracy and fraud claims tried alongside those of her co-Defendants.  As proffered by the United States, the Government will prove that she was an integral part of the underlying scheme.  (USA Br. at 16.) Indeed, "[i]f the evidence to be introduced at trial 'connects each of the defendants to an overall general scheme, joinder is proper [under Rule 8(b)].'"  <u>Kemp</u>, 2004 U.S. Dist. LEXIS 24189 at *7 (quoting <u>United States v. Stout</u>, 499 F. Supp. 598, 599 (E.D. Pa. 1980)).  Moreover, even though the Government chose to bring separate unemployment fraud charges against Defendants here individually in separate counts, this does not change the fact that the unemployment fraud claims are still substantially related to each other.  Accordingly, the charges brought against Manzoni should be tried alongside those of her co-Defendants.

The Court is more receptive to Manzoni's argument that the charges brought against her related to the timeshare fraud scheme should be tried separately from the charges brought against her for defrauding the NJDOL because the two schemes lack relatedness and do not share a common nexus. The Third Circuit has indicated that "[i]t is not enough that defendants are involved in offenses of the same or similar character; there must exist a transactional nexus in that the defendants must have participated in 'the same act or transaction, or in the same series of acts or transactions[.]'" United States v. Jimenez, 514 F.3d 62, 82-83 (3d Cir. 2008). Although mere factual overlap between two charges is not enough to justify joinder, see United States v. Myers, 700 F.Supp. 1358 (D.N.J. 1988), it has likewise been recognized that "[a]ny reference to a connection between charges will generally suffice for the purposes of sustaining joinder." Kemp, 2004 U.S. Dist. LEXIS 24189 at *9. Indeed, "[a]s long as a logical relationship exists between charges, courts will allow the joinder of defendants under Rule 8(b)." Id. at *7. Moreover, as noted above, the "same act or transaction" language of Rule 8(b) has been defined broadly to include a "common plan or scheme." Fumo, 2008 U.S. Dist. LEXIS 1803 at *2 (citations omitted).

The United States' proposed transactional nexus between the two charged frauds — that Manzoni's failure to report the income

she collected from her work at the VO Group in furtherance of the timeshare fraud constituted the basis of the unemployment fraud charge — is akin to cases in which defendants have been jointly charged with fraud and tax evasion.  It has previously been recognized that "[j]oinder of tax and non-tax claims is not unusual."  United States v. McGill, 964 F.2d 221, 241 (3d Cir. 1992).  Several circuit courts of appeals, including our own, have recognized that:

> Tax charges may be joined with fraud charges if the unreported income arises solely and directly out of the fraudulent scheme.  When the unreported income is derived from the charged conduct, the tax offense is based on the same act or transaction as the other offenses. Moreover, failure to file tax returns may have a logical and temporal relationship with other offenses charged in the indictment such that the tax offenses are connected with or constitute parts of a common scheme or plan.

United States v. Midkiff, 614 F.3d 431, 439 (8th Cir. 2010)(citing United States v. Bibby, 752 F.2d 1116, 1121 (6th Cir. 1985); United States v. Kopituk, 690 F.2d 1289, 1313 (11th Cir. 1982); United States v. Kenny, 645 F.2d 1323, 1344 (9th Cir. 1981); United States v. Johnson, 462 F.3d 815, 822 (8th Cir. 2006)); see also United States v. Riley, 621 F.3d 312, 334 (3d Cir. 2010)(citing Bibby).  Since the joinder of Manzoni's timeshare and unemployment fraud claims presents a close question in this case, a survey of the case law in this area of the law is helpful here.

At oral argument, the parties largely disputed the applicability of the Third Circuit's decision in United States v. Riley, 621 F.3d 312 (3d Cir. 2010) to the instant case. In Riley, former Newark Mayor Sharpe James and his paramour, Tamika Riley, were charged with devising a fraudulent scheme related to the conveyance of city-owned parcels of property. Id. at 318. Sharpe assisted Riley's acquisition of land parcels, which she was supposed to develop in accordance with a redevelopment plan established by the city. Id. at 318-19. Riley, however, only developed two of the properties conveyed to her, and quickly sold the others without making any improvements to them at a substantial profit that she failed to report to the Internal Revenue Service ("IRS"). Id. at 319-20. Both James and Riley were eventually indicted for their fraudulent scheme related to the city-owned property. Id. at 320. Only Riley, however, was charged with tax evasion for her failure to report to the IRS the income she derived from the scheme. Id. James moved to sever Riley's tax fraud charges from the land fraud counts under Rule 8(b), arguing that they lacked a common transactional nexus. Id. at 334. The Third Circuit, however, disagreed, and affirmed the district court's denial of the severance request on the basis that "Riley's failure to report income earned from the land fraud scheme [] led to her Tax Fraud Counts. Because the tax evasion arose directly from the land fraud proceeds, it was

in the interest of judicial efficiency to join these claims."
Id.

The Eighth Circuit Court of Appeals addressed a similar scenario in United States v. Midkiff, 614 F.3d 431 (8th Cir. 2010). In that case, the defendant was charged with mail fraud, wire fraud, promotional money laundering, conspiracy to commit mail fraud, and conspiracy to commit promotional money laundering related to his role in the execution of an expansive Ponzi scheme.[9] Id. at 438. Additionally, Midkiff was also charged with four counts of failure to file tax returns related to the profits he earned from the fraudulent scheme. Id. at 439. Midkiff acknowledged that the fraud scheme may have been a source of income for him, but moved to sever the tax fraud counts from the other charges on the basis that they were not sufficiently related and did not form part of a common scheme or plan.[10] Id. The Eighth Circuit found that the fraud and tax

---

[9]    A "Ponzi scheme" is defined as: "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments." *Black's Law Dictionary* 1180 (7th ed. 1999).

[10]    The Court acknowledges that the defendant in Midkiff sought severance relief pursuant to subpart (a) of Rule 8 because that case only involved a single defendant, thereby making subpart (b) inapplicable. There is surprisingly little case law related to the joiner of fraud and tax evasion counts and severance requests pursuant to Rule 8(b) in multi-defendant cases. Despite the fact that Midkiff relied on subpart (a) of Rule 8,

counts were sufficiently related, however, and stated that: "[b]ecause his unreported income was derived from the charged [fraudulent] conduct, the [ ] tax counts were properly joined with the fraud counts." Id. at 440.

In comparison to Riley and Midkiff, the Second Circuit found that severance of counts was necessary in United States v. Shellef, 507 F.3d 82 (2d Cir. 2007). In Shellef, the defendant was engaged in a complex scheme to distribute and sell CFC-113, a highly-regulated industrial chemical. Id. at 87. Since CFC-113 had detrimental environmental effects, the federal government imposed an excise tax on its sale and use. Id. at 89. Shellef and his co-conspirator devised a scheme in which they sold several thousand pounds of CFC-113 between the years of 1998 and 2000 without paying the excise tax on the chemical, for which they were subsequently charged with conspiracy, wire fraud, and money laundering. Id. at 93, 95. Shellef was likewise solely charged with failing to report his total reportable income to the IRS on his personal tax return in 1996, and falsifying corporate tax returns in 1996 and 1999. Id. at 94-95. The Second Circuit found that the joinder of the non-tax and tax fraud counts was improper because the funds generated by the wire fraud, money laundering, and conspiracy schemes were

_____

the Court nevertheless finds the logic of the Eighth Circuit persuasive here.

unrelated to the unreported income that served as the basis of the tax fraud counts. Id. at 99. The Second Circuit largely based its decision on the fact that Shellef's failure to report the entirety of his gross income on his personal tax return in 1996 occurred before the execution of the fraud and conspiracy in 1998 through 2000. Id. As to the corporate tax charges, the court noted that, "the fact that the businesses that produced the [] unreported income were also subsequently used to perpetrate the alleged conspiracy and wire fraud does not justify a conclusion that the offenses charged are based on the same act or transaction, or are connected with constitute parts of a common scheme or plan[.]" Id. (internal citation and quotation marks omitted). Thus, the Second Circuit found that severance was required.[11]

The Second Circuit also found that severance of counts was appropriate in United States v. Litwok, 678 F.3d 208 (2d Cir. 2012). In that case, the defendant, Litwok, and her close friend engaged in a fraudulent scheme in which they filed false

_____

[11] It is not entirely clear from the text of Shellef whether the Second Circuit's decision was based on subpart (a) or (b) of Rule 8. The court, in fact, engaged in an extensive discussion of which provision applied, in which it noted that — unlike the Third Circuit — it remains unsettled in the Second Circuit whether subpart (a) or (b) of Rule 8 applies in multi-defendant cases. See id. at 97 n.12. The Second Circuit therefore did not explicitly select one provision of Rule 8 as the basis of its ruling, but instead held that its ultimate decision would be the same regardless of which provision applied. Id. at 97-98.

claims with their insurer related to their East Hampton, New York properties.  Id. at 211.  Notably, Litwok operated a number of private equity companies from her East Hampton home.  Id. at 212.  Litwok routinely commingled corporate and personal funds in her businesses, and failed to file tax returns for the income she garnered from the companies.  Id.  Litwok was eventually charged in a single indictment with mail fraud related to the insurance fraud and tax evasion for failure to file appropriate tax returns.  Id.  The Second Circuit found that severance was appropriate because there was no link between Litwok's insurance fraud and her failure to report income from a business that she operated out of the home upon which the insurance claim was based.[12]  Id. at 216-17.

Finally, the Court considers the Sixth Circuit's decision in United States v. Bibby, 752 F.2d 1116 (6th Cir. 1985) — a case relied on and repeatedly cited to by the Defense at oral argument before this Court.  Bibby involved an illegal kickback scheme devised by employees of Honeywell Information Systems, Inc. and a former Tennessee state senator, in which the defendants received a kickback from the sale of certain computer systems.  Id. at 1119-21.  One of the illegal transactions

---

[12]    The Court once again notes that the Second Circuit's decision in Litwok was premised upon Rule 8(a), presumably because that was a single-defendant case. Nevertheless, the Court finds the Second Circuit's reasoning instructive here.

involved a sale to Shelby County, which the senator facilitated.
Id.  In return for his services, the senator received a
commission in excess of $130,000.  Id. at 1120.  The defendants
were eventually indicted for conspiracy, mail fraud, and wire
fraud related to their fraudulent scheme, and the senator was
independently charged with tax fraud for failure to report his
$130,000 commission payment on his tax return and for
impermissibly deducting attorneys' fees on his tax returns.  Id.
The Honeywell employee defendants argued that the senator's tax
fraud counts should be severed because they lacked a common
nexus with the other counts.  Id. at 1121.  The Sixth Circuit
found that the joinder of the senator's tax fraud charge related
to the unreported commission was properly joined with the other
counts because "[f]ailure to report the income from an illegal
activity is an act which does arise directly out of the common
enterprise [since] concealment of ill-gotten gain is an integral
part of assuring the success of that illegal activity."  Id.
The Sixth Circuit found, however, that the same could not be
said for the tax fraud charges related to the attorneys' fees
deductions because the senator's "fraudulent deduction of
attorney's fees had absolutely nothing to do with defendants'
overall scheme to defraud Honeywell."  Id.[13]

---

[13]  Yet again, the Sixth Circuit referenced both subparts (a)
and (b) of Rule 8 in ultimately rendering its decision.

Upon consideration of the case law, this Court finds that the instant case is more akin to Riley and Midkiff than Shellef and Litwok, and that severance of Manzoni's timeshare fraud charges from her unemployment fraud charges is therefore not warranted.  Unlike the tax fraud counts in Shellef, Litwok, and the second set of tax fraud counts in Bibby that bore absolutely no relation to the underlying fraudulent schemes, Manzoni's unemployment fraud charge is correlated to her timeshare fraud charge.  The Indictment charges Manzoni with falsely representing to the NJDOL that she was unemployed — and therefore fraudulently obtaining unemployment benefits — when in actuality she was garnering income from her management position at the VO Group.  Put differently, had Manzoni not been conducting activities in furtherance of the scheme at the VO Group for which she was compensated, she would not have committed the unemployment fraud.  Manzoni's work at the VO Group is therefore an integral part of the unemployment fraud charge.  Moreover, as recognized in Bibby, "concealment of ill-gotten gain is an integral part of assuring the success of that illegal activity."  Id.  Since Manzoni's unreported income arose solely and directly out of her actions related to the timeshare

---

Notably, the Sixth Circuit relied on subpart (b) in finding that the Honeywell employee defendants' charges were properly joined with the senator's tax fraud charge, but relied on subpart (a) in holding that the senator's non-tax fraud charges were properly joined with his tax fraud charges.

fraud scheme, a scheme she had every reason to conceal, her
unemployment fraud charge, which required for its success the
concealment of that same income, shares a logical and temporal
relationship with the other offenses charged in the Indictment,
and the requisite transactional nexus therefore exists between
the two charges.  Accordingly, the Court will deny Manzoni's
motion for severance pursuant to Rule 8(b).

### C.  Bills of Particulars

Both Adam Lacerda and Genevieve Manzoni move the Court to
order the Government to produce a bill of particulars to better
explain the charges brought against them.  More specifically,
Manzoni argues that the Indictment contains allegations of a
broad overall scheme, but fails to specify conduct showing that
she participated in and furthered the timeshare and unemployment
fraud schemes.  (Manzoni Br. at 1-2.)  Manzoni thus argues that
she ought to be advised of what it is specifically that she is
alleged to have done or said in furtherance of the schemes in
order to properly defend herself at trial.  (Id.)  Similarly,
Adam Lacerda avers that the Indictment does not identify what
misrepresentations were made to which victims by which Defendant
and when. (Adam Lacerda Mot. for Bill of Particulars at 10.)

A bill of particulars is a "formal, detailed statement of
the claims or charges brought by a plaintiff or a prosecutor[.]"
*Black's Law Dictionary* 177 (8th ed. 2004).  Under Rule 7(f) of

the Federal Criminal Rules, a trial court may direct the filing

of a bill of particulars, and federal trial courts have always

had very broad discretion in ruling upon requests for such

bills.  United States v. Kemp, Crim.No.04-370, 2004 U.S. Dist.

LEXIS 24189, at *24 (E.D. Pa. Dec. 2, 2004)(citing Will v.

United States, 389 U.S. 90, 98-99 (1967); United States v.

Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972)).  Rule 7(f) provides

in full as follows:

> The court may direct the government to file a bill of
> particulars. The defendant may move for a bill of
> particulars before or within 14 days after arraignment
> or at a later time if the court permits. The
> government may amend a bill of particulars subject to
> such conditions as justice requires.

Fed. R. Crim. P. 7(f).  The Third Circuit addressed the purpose

and scope of a bill of particulars in United States v.

Addonizio, 451 F.2d 49 (3d Cir. 1971):

> The purpose of the bill of particulars is to inform
> the defendant of the nature of the charges brought
> against him to adequately prepare his defense, to
> avoid surprise during the trial and to protect him
> against a second prosecution for an inadequately
> described offense. A bill of particulars should
> fulfill this function when the indictment itself is
> too vague and indefinite for such purposes.

Id. at 63-64.  A bill of particulars is only warranted when the

indictment is too vague to allow the defendant to: (1)

understand the charges brought against him and prepare a

defense; (2) avoid unfair surprise; and (3) assert a claim of

double jeopardy where appropriate.  See United States v. Urban,

404 F.3d 754, 771-72 (3d Cir. 2005); United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004). "Only where an indictment fails to perform these functions, and thereby significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial, will we find that a bill of particulars should have been issued." Urban, 404 F.3d at 772 (internal citations & quotation marks omitted).

"The current case law does not favor granting motions for bills of particulars." Kemp, 2004 U.S. Dist. LEXIS 24189 at *24. Indeed, there is no reported Third Circuit decision in which a district court has been reversed for failure to grant such a motion, and the most recent case doing so in the Second Circuit is from 1987. See United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987)(reversing because of denial of bill of particulars and finding defendants were hindered in preparing their defense by district court's failure to compel government to reveal crucial information not available from indictment). "Courts are especially reluctant to direct the filing of a bill of particulars when the government has provided the defendant with extensive pre-trial discovery." Kemp, 2004 U.S. Dist. LEXIS 24189 at *25 (internal citations omitted). "Moreover, when information requested in a motion for a bill of particulars is available in another form, a bill of particulars is not required." Id. (internal citation omitted). It has also been

recognized, however, that disclosure by the government of
"mountains of documents" is not an adequate substitute for a
bill of particulars when the government's disclosure does not
provide guidance regarding what it seeks to prove at trial.  Id.
(citing United States v. Stocker, Crim.No.89-00463-011990, U.S.
Dist. LEXIS 13590 (E.D. Pa. Oct. 10, 1990); United States v.
Wabo, 290 F.Supp.2d 486 (D.N.J. 2003)(denying motion for bill of
particulars because indictment contained sufficient factual and
legal information for defense to prepare its case)).
Furthermore, although Rule 7(f) is construed liberally, it does
not permit a defendant to receive "wholesale discovery of the
Government's evidence."  United States v. Rosa, 891 F.2d 1063,
1066 (3d Cir. 1989).  Indeed, a bill of particulars is "not a
general investigative tool for the defense or a device to compel
pretrial disclosure of the government's evidence." United
States v. Ballesteros Gutierrez, 181 F.Supp.2d 350, 356
(S.D.N.Y. 2002).

Here, Defendant Manzoni requests a bill of particulars that
would provide the following:

> (1)  information as to each customer with whom she
> communicated in the timeshare fraud;
> (2)  the specific false statements she made to any
> customer;
> (3)  copies of each unemployment check she cashed and
> was not entitled to;
> (4)  an identification of specific statute, rule or
> regulation upon which the prosecution intends to rely
> with respect to the unemployment fraud; and

> (5) the date, manner, and contents of any statement
> she made to the NJDOL that were false.

(Manzoni Br. at 9.) Defendant Adam Lacerda makes largely similar requests, requesting that the Court direct the United States to file a bill of particulars detailing the following information:

> (1) the identity of purported victims not specifically identified in the Indictment;
> (2) specific misrepresentations/omissions made to each victim,
> (3) the identity of the individual who made the alleged specific misrepresentations/omissions to the victims; and
> (4) when such misrepresentations were made.

(Adam Lacerda Br. at 7.) Both Defendants contend that the Government has merely provided them with mountains of evidence without any roadmap as to the contents. For its part, the United States contends that it has been accommodating by allowing Defendants to inspect evidence at the FBI's office, sending defense counsel compact discs containing certain documents produced by victims of the fraud, engaging in "show and tells" with Defendants to provide them with details of the charges brought against them, and making available to them the physical evidence seized during the search of the VO Group offices. (USA Br. at 27, 31.) The United States further contends that it intends to comply with its Jencks and Giglio obligations, and that therefore even more information will

shortly become available to Defendants well in advance of trial to help them adequately prepare a defense.[14]  (Id. at 28.)

In United States v. Sourlis, 953 F.Supp. 568 (D.N.J. 1996), the defendants in a conspiracy and fraud case sought a bill of particulars to inform them of the specific misrepresentations they allegedly made to each victim.  Id. at 578.  The district court declined to compel the government to provide this information on the basis that the contents of the indictment were sufficient to put the defendants on notice of the charges brought against them, and that allowing otherwise would permit the defendants "to engage in 'wholesale discovery of the Government's evidence.'"  Id. at 579 (quoting United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1974)).

Sourlis is directly applicable here because Adam and Manzoni seek the production of the specific misrepresentations that they allegedly made to victims and the NJDOL.  Such a request, however, is outside the purview of a bill of particulars.  As has been noted by our sister court in the Southern District of New York, a "request to compel the Government to identify any and all false and fraudulent statements made as part of the alleged criminal scheme [ ] is beyond the proper scope of a bill of particulars."  United

_____

[14]    Issues related to the Government's Jencks, Giglio, and Brady obligations are more fully addressed below.

States v. Zoernack, Crim.No.04-868, 2005 U.S. Dist. LEXIS 15805, at *8 (S.D.N.Y. Aug. 2, 2005). Here, the Indictment specifically alleges that, in furtherance of the timeshare fraud scheme, Defendants falsely represented to timeshare owners that the VO Group: "(a) could pay off the owners' timeshare mortgages; (b) could have the owners' timeshares cancelled or sold; (c) received a complaint previously filed by the owner that was forwarded to the VO Group for investigation; (d) worked with banks and lending institutions; (e) had the ability to 'settle' or pay off a timeshare owner's mortgage for a fraction of the owner's current mortgage balance; and (f) would negotiate with, and send letters and other cancellation documentation to the timeshare developer, loan holder, or other merchant on the owner's behalf." (Superseding Indictment ¶ 8.) The Indictment likewise details thirty-seven specific acts committed by Defendants in furtherance of the scheme. (Id. ¶¶ 16(a-kk).) These acts reference victims by their initials, provide precise monetary amounts and dates, and detail the means utilized in furtherance of the conspiracy. (Id.) This level of specificity is sufficient to put Adam and Manzoni on notice of the charges brought against them, and is beyond what is legally required of the United States prior to proceeding to trial. See United States v. Mitlof, 165 F.Supp.2d 558, 569-570 (S.D.N.Y. 2001)(rejecting motion for bill of particulars in fraud case as

improper request for "'when,' 'wheres,' and 'with whoms'").

Indeed, "[a] bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation. A bill of particulars is intended to give the defendant only the minimum amount of information necessary to permit the defendant to conduct his own investigation." United States v. Boffa, 513 F. Supp. 444, 485 (D.Del. 1980); United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985)(citations omitted). As such, the Government should not be required to disclose the specific information related to Defendants' alleged misrepresentations.

Adam and Manzoni also request the names and identities of the specific victims that they are charged with defrauding. At present, at least ten victims are identified in the Indictment by their initials, and the Government has turned over to the Defense compact discs containing certain documents provided to the FBI by the victims. Aside from the victims identified in the Indictment, the Government advised the Court at oral argument that it had also provided the Defense with a list of approximately thirty victims that it may call as witnesses or otherwise rely on at trial. The Government has likewise made available for Defendants' review all the 302s of the victims and cooperating witnesses.

It has repeatedly been recognized that the government is not required to disclose the names of witnesses to the defense by means of a bill of particulars.  See United States v. Mitchell, 540 F.2d 1163, 1166 (3d Cir. 1976)(citing Addonizio, 451 F.2d at 62); United States v. Johnson, 504 F.2d 622, 628 (7th Cir. 1974)("It is well-settled that a bill of particulars cannot be used to obtain a list of the government's witnesses[.]"); United States v. Grier, Crim.No.12-161, 2012 U.S. Dist. LEXIS 163010, at *6 (W.D. Pa. Nov. 15, 2012)(citing United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1975)); United States v. Moses, Crim.No.02-040, 2002 U.S. Dist. LEXIS 11393, at *5 (E.D. Pa. Apr. 5, 2002).  In accord with this long line of precedent, Defendants' requests to obtain the full list of the names of the victims will be denied.  In any event, the United States has proffered that it will provide the Defense with Jencks and Giglio materials at least two weeks in advance of trial, which will include the identities of the victims who will testify at trial.  The government's accommodating offer beyond what the law requires serves as another reason why Defendants' request for this information should be denied.

With respect to Manzoni's requests that she be provided with "an identification of any specific statute, rule or regulation upon which the prosecution intends to rely with respect to the unemployment fraud," (Manzoni Br. at 9), it is

well established that the government is not required to explain to defendants through a bill of particulars "the legal theories upon which it intends to rely at trial."  United States v. Delle Donna, 552 F.Supp.2d 475, 498 (D.N.J. 2008); United States v. Korbe, Crim.No.09-0005, 2010 U.S. Dist. LEXIS 57665 (W.D. Pa. June 10, 2010); United States v. Green, Crim.No.08-26, 2009 U.S. Dist. LEXIS 45475, at *43 (W.D. Pa. June 1, 2009)(citing Addonizio, 451 F.2d at 63-64).  As such, this request will also be denied.

Finally, Manzoni also asserts that she is entitled to more information regarding the unemployment fraud charges, and that she should be provided with copies of each unemployment check that she allegedly fraudulently cashed.  Counts 40-42 of the Indictment detail the process through which the NJDOL administers unemployment benefits.  (Superseding Indictment, Counts 40-42, ¶¶ 2-10.)  According to the Indictment, an individual could apply for benefits by phone or Internet, and could obtain benefits upon answering certain questions and providing relevant information to the NJDOL.  (Id. ¶ 3.)  After a claim was deemed eligible, the NJDOL calculated a weekly benefit rate and a maximum benefit amount for each claimant, which it paid out using a seven-day period.  (Id. ¶ 4.)  In order to maintain unemployment benefits, claimants were required to complete a bi-weekly certification process, in which they

certified to the NJDOL that they were not working or otherwise collecting income.  (Id. ¶¶ 7-10.)  The Indictment states that the Defendants "applied for unemployment benefits from the State of New Jersey by making periodic telephone calls or Internet requests for continued payment of [] benefits."  (Id. ¶ 12.) Although Manzoni is charged in Count 44 and not Counts 40-42, Count 44 specifically references the information provided in the earlier counts and states that: "for the purpose of executing the scheme *described in paragraphs 2 through 16 of the Counts 40-42 above*, [Manzoni] did knowingly and with fraudulent intent transmit and cause to be transmitted by means of wire communications in interstate commerce the unemployment compensation benefit payment[.]"  (Id., Counts 43-44, ¶ 2)(emphasis added).  This information contained in the Indictment is sufficient to aid her in the preparation of a formidable defense.  As to being provided copies of the specific checks, the Government proffers that it has given Manzoni open access to the evidence, and has provided her counsel with numerous documents from the NJDOL, including records of payments it sent to her.  The Court is unaware of any decision within this Circuit requiring Defendant to be provided with specific copies of such information by means of a bill of particulars. Rather, as indicated by the Court that oral argument, much of Manzoni's argument related to this sought information appears to

be that the Government will be unable to prove that she actually engaged in unemployment fraud.  But an argument that the Government cannot prove its case at trial is different from an argument requiring it to disclose certain information and turn over evidence in advance of trial.  Accordingly, this request will likewise be denied.

    **D.**    **Production of <u>Jencks</u> Materials and Rule 16 Disclosures**

Defendants Adam, Ashley, and DiVenti request an order from the Court compelling the Government to provide them with certain materials and information pursuant to the <u>Jencks</u> Act, 18 U.S.C. § 3500 <u>et seq.</u>

Under the <u>Jencks</u> Act, the government must produce to the defense any statements and reports by government witnesses and prospective government witnesses that are in its possession related to the subject matter as to which the witness testified. <u>Jencks v. United States</u>, 353 U.S. 657 (1957).  Under the Act, the government is not required to produce such evidence until after the witness has testified on direct examination.  <u>United States v. Maury</u>, 695 F.3d 227, 248 (3d Cir. 2012).  There is, however, a "prevailing" and "salutary" practice with respect to federal prosecutions of delivering <u>Jencks</u> materials to defense counsel sufficiently in advance of the conclusion of direct examination so as to obviate trial interruptions.  <u>Id.</u> at 248

n.18; see also United States v. Murphy, 569 F.2d 771, 773 n.5
(3d Cir. 1978).

In the instant case, it is undisputed that the United
States has already made the 302s of its witnesses available for
defense counsel's review.  In order to review the evidence,
defense counsel must make an appointment with a case agent at
the FBI's offices in Northfield, New Jersey.  The Government
has, however, only made the witness statements and interviews
available for *review*, but has not permitted Defendants to *copy*
any of these materials.  The United States proffers that it will
voluntarily provide the Defense with all Jencks materials that
it intends to utilize at trial at least fourteen days before the
start of trial.  Defendants, however, argue that the sheer
volume of the paper evidence in this case makes it extremely
burdensome to review the evidence and adequately compile a
defense, and therefore request the Court to order the Government
to permit them to copy the 302s (at their own expense) of the
victims and cooperating witnesses in this case.[15]  In support of
this request, Ashley asserts that the United States has already
waived any objection to such a request by making the 302s
preliminarily available for review.  (Ashley Lacerda Br. at 8.).

---

[15]    Indeed, the Defense asserts that the binders of testimonial
materials contain over 700 memoranda of interviews and over
30,000 individual pieces of paper to review. (Adam Lacerda Rule
16 Mot. at 2, 5 n.5.)

The United States objects, arguing that it will provide the

Defense with copies of the necessary 302s at least fourteen days

before the start of trial, and that the Defense is not entitled

to any other witness statements under the <u>Jencks</u> Act.[16]  (USA Br.

at 34-35.)

The parties' instant dispute does not concern the

Government's unwillingness to produce <u>Jencks</u> materials, but

rather is a discovery management dispute.  Federal Rule of

Criminal Procedure 16 governs discovery in criminal cases, and

provides, in pertinent part, as follows:

> Upon a defendant's request, the government must permit
> the defendant to inspect and to copy or photograph
> books, papers, documents, data, photographs, tangible
> objects, buildings or places, or copies or portions of
> any of these items, if the item is within the
> government's possession, custody, or control and:
>> (i) the item is material to preparing the
>> defense;
>> (ii) the government intends to use the item in
>> its case-in-chief at trial; or
>> (iii) the item was obtained from or belongs to
>> the defendant.
>>              . . .
> (2) [T]his rule does not authorize the discovery or
> inspection of reports, memoranda, or other internal
> government documents made by an attorney for the
> government or other government agent in connection
> with investigating or prosecuting the case. Nor does
> this rule authorize the discovery or inspection of

---

[16]    The United States also asserts that Defendants have a
reciprocal duty to provide it with any prior statements of
witnesses that they intend to use at trial.  This assertion is
correct, <u>see</u> <u>United States v. Peoples</u>, Crim.No.11-390A, 2012
U.S. Dist. LEXIS 110859, at *9 (W.D.N.Y. Aug. 07, 2012), and the
Defense should be mindful of providing the Government with this
information in advance of trial.

statements made by prospective government witnesses
except as provided in [the Jencks Act,] 18 U.S.C. §
3500.

Fed. R. Crim. P. 16(a)(1)(E), (a)(2). As such, the Federal
Rules require the government to permit defendants to inspect *and
copy* papers and documents that are material to preparing a
defense or intended to be used by the government at trial, but
subject these obligations to a "carveout" for attorney or agent
work product made in connection with investigating and
prosecuting the case. Maury, 695 F.3d at 249. Moreover, Rule
16 only requires the government to permit the defense to inspect
and copy reports of government witnesses to the extent it is
required to do so under Jencks. In other words, under Rule 16,
the government need only provide the defense with a copy of a
government witnesses's statement or report *after* the witness has
testified on direct examination at trial. See 18 U.S.C. §
3500(a)("In any criminal prosecution brought by the United
States, no statement or report in the possession of the United
States which was made by a Government witness or prospective
Government witness (other than the defendant) shall be the
subject of subpoena, discovery, or inspection until said witness
has testified on direct examination in the trial of the case.").
Furthermore, it has previously been recognized that the
defendant bears the burden of establishing that the sought
evidence is material to his defense. See United States v.

Poulin, 592 F.Supp.2d 137, 142 (D. Me. 2008); United States v. Rigas, 258 F.Supp.2d 299, 307 (S.D.N.Y. 2003); United States v. Elliot, 363 F.Supp.2d 439, 449 (N.D.N.Y. 2005)("The defendant must establish a *prima facie* showing of materiality."). Evidence is considered material if "it could be used to counter the government's case or to bolster a defense.  Stated another way, materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case.  There must be some indication that pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."  Id. (citing United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993); United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991))(internal quotation marks omitted).

Given the large amount of evidence in this case, factual circumstances related to the disqualification of Adam's previous counsel, and the rapidly approaching trial date, the Court will grant Defendants' request to copy documents presently located at the FBI Office in Northfield, but only to the extent such documents are considered to be material to preparing a defense. By so holding, the Court is not obligating the Government to sort through the evidence and specify for Defendants what evidence is material to their defense.  Indeed, the burden of establishing materiality falls upon Defendants.  Nor shall this

ruling be construed by the Defense as permission to copy each and every document housed at the FBI office.  To be clear, a document may only be copied if the Defense believes it could be used to counter the Government's case or to bolster a defense. The defense may designate such documents when they are granted access to them and work out a procedure with the government to have them copied at the Defendants' expense.0

Moreover, at oral argument, a significant issue of dispute between the parties was the Defense's access to and ability to obtain the identity and 302s of the victims and cooperating witnesses.  The Defense argued that it needs this information to assist it in preparing for trial, and that it should be permitted to copy the 302s of these individuals rather than be restricted to inspecting them on the Government's turf and schedule.  The United States objected, arguing that it is not required to provide the Defense with a full list of the victims, and that it has already made the 302s available for Defendants' review at the FBI Offices.  The United States further proffered that it will voluntarily turn over the 302 of any testifying witness two weeks prior to the start of trial and therefore well in advance of its obligations under the <u>Jencks</u> Act, and that it has already given the Defense a list identifying approximately thirty victims that it intends to call as witnesses or otherwise rely on at trial.  The Government thus argues that it has

provided Defendants with more than sufficient information to help them narrow the scope of their defenses, has gone above and beyond what it is legally required to do at this point in time, and that requiring it to provide the Defense with more information would essentially be punishing the Government for its already-provided accommodation and assistance.

It is true that the Government has surpassed its obligations under the Jencks Act by making certain information available to the Defense well in advance of trial, and the Court commends it for so doing. As explained more fully above with respect to Defendants' requests for a bill of particulars, it is likewise true that the Government is not required to provide the Defense with a full list of the victims at this point in time. By the same token, however, the Government has already given the Defense a list of approximately thirty victims whom it is likely call as witnesses at trial. Furthermore, this Court has also already accepted the guilty pleas of several cooperating witnesses in this matter. Thus, given that these victims and cooperating witnesses have already been made known to the Defense, the Court sees no harm in permitting the Defense to inspect and copy their 302 statements.[17] Accordingly, the Court

---

[17] For the purposes of the Jencks Act, the Court construes these statements to be the statements of the agents who prepared them and not the victims or witnesses themselves. The Court also considers them material for the purposes of Fed.R.Crim.P. 16.

will order the Government to provide copies to the Defense of all 302s containing statements of the approximately thirty alleged victims, as well as the 302s of cooperating witnesses, who may be called as witnesses at trial. Since the Government has already made this information known to Defendants, providing copies of these 302s to the Defense will not harm the Government, undermine its case-in-chief, or punish it for exceeding their <u>Jencks</u> obligations. In contrast, as proffered by the Defense, obtaining copies of these documents will significantly assist the Defendants in preparing for trial. Accordingly, the Court shall grant Defendants' request on these grounds.

### E. Production of <u>Brady</u> & <u>Giglio</u> Materials

Several Defendants request the Court to order the United States to provide them with their mandatory disclosures under the <u>Brady</u> and <u>Giglio</u> doctrines.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment" irrespective of the good or bad faith of the prosecutor. <u>Id.</u> at 87. As declared by the Third Circuit, federal courts "abhor a <u>Brady</u> violation." <u>United States v. Pelullo</u>, 14 F.3d 881, 886 (3d Cir. 1994). However, although

<u>Brady</u> places an affirmative obligation on prosecutors "to learn
of any favorable evidence known to the others acting on the
government's behalf in the case," it does not impose a duty on
the government "to learn of information possessed by other
government agencies that have no involvement in the
investigation or prosecution at issue."  <u>United States v.</u>
<u>Pelullo</u>, 399 F.3d 197, 216 (3d Cir. 2005).  Thus, the
prosecution is "only obligated to disclose information known to
others acting on the government's behalf in a particular case."
<u>Id.</u> at 218.

    In <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the
Supreme Court refined the <u>Brady</u> rule by indicating that the
prosecution "team" would be viewed as an entity for disclosure
purposes.  In <u>Giglio</u>, the Supreme Court vacated a conviction and
ordered a new trial where the key witness for the prosecution
falsely testified that no promises had been made not to
prosecute him.  <u>Id.</u> at 152.  Even though the trial prosecutor
did not have actual knowledge of such a promise, the Supreme
Court recognized that "whether the nondisclosure was a result of
negligence or design, it is the responsibility of the
prosecutor.  The prosecutor's office is an entity and as such it
is the spokesman for the Government."  <u>Id.</u> at 154.  As such, in
light of <u>Giglio</u>, the government now must disclose evidence that
goes to the credibility of crucial prosecution witnesses, even

in the absence of a request for such information by the defense. United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991) (citing United States v. Agurs, 427 U.S. 97 (1976)).

In the instant case, the United States proffers that it understands its disclosure obligations under Brady and Giglio, and does not oppose Defendants' requests in this regard. The United States further avers that it is not aware of any exculpatory information in its possession that has not already been turned over to the Defense, but, if it discovers any such additional evidence, it will readily provide it to Defendants. As they are unopposed, Defendants' motions on these grounds will be granted.

### F.    Disclosure of 404(b) Evidence

Defendant DiVenti requests the Court to enter an order compelling the Government to disclose, at least ten days prior to the start of trial, any evidence it has in its possession of Defendants' prior crimes, wrongs, or acts pursuant to Rule 404(b) of the Federal Rules of Evidence. DiVenti also requests a pretrial hearing to determine the propriety of the use of such evidence under Rule 404(b).

According to the Court's Order for Discovery & Inspection entered on January 30, 2013, [Docket No. 101], the United States is required to "provide notice to the defense of all evidence it intends to offer" of Rule 404(b) evidence at least ten days

before the trial start date.  The United States proffers that it intends to comply with this Order in its future disclosure obligations.  Accordingly, DiVenti's motion will be denied without prejudice as it is premature since the United States has not yet provided the Defense with any 404(b) evidence.  If such evidence is ultimately disclosed to Defendants, then any one of them may file a motion *in limine* seeking to exclude such evidence for a lawful reason.[18]

### G.   Disclosure of Expert Testimony

DiVenti likewise requests the Court to enter an order compelling the Government to provide him with a written summary of the testimony of any expert witness that the Government intends to introduce at trial pursuant to Rules 702, 703, and 705 of the Federal Rules of Evidence.  The United States responds that it presently does not intend to present any expert witness testimony at trial, but that, if it does decide to do so in the future, it will provide Defendants with a written summary of the expert's testimony that complies with Federal Criminal Rule 16.  Accordingly, this request is granted.

---

[18]   The United States likewise requests a reservation of its rights at trial to use 404(b) evidence without first having to give notice to Defendants.  This request is likewise premature, and the Court will consider the propriety of such a reservation of rights, if any, during *in limine* motions.

## III. CONCLUSION

For the reasons stated above and expressed by the Court on the record at the June 13, 2013 oral argument, Defendants' pre-trial motions are granted in part and denied in part. This Memorandum Opinion shall resolve all issues related to the parties' pre-trial motions.

An appropriate Order follows.

*/s/ Noel L. Hillman*
_____
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

Dated: June 19, 2013